**SCHURZ COMMUNICATIONS, INCORPORATED, et al., Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

Nos. 91–2350, 91–2597, 91–2598, 91–2684, 91–2855, 91–2883, 92–1117, 92–1120 and 92–1484.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 2, 1992.

Decided Nov. 5, 1992.

Supplemental Proceeding on Remedy Dec. 7, 1992.

Gregory M. Schmidt, Martin Wald, Covington & Burling, Washington, DC, for petitioner CBS Television Network Affiliates Ass'n.

James F. Rill, Dept. of Justice, Antitrust Div., Robert Pettit, Daniel M. Armstrong (argued), Sue Ann Kanter, F.C.C., Washington, DC, for respondent F.C.C.

Catherine G. O'Sullivan, James F. Rill, Dept. of Justice, Antitrust Div., Appellate Section, Robert Pettit, F.C.C., Nancy C. Garrison, Dept. of Justice, Antitrust Div., Appellate Section, Washington, DC, for respondent U.S.

John D. Lane, Ramsey L. Woodworth, Robert M. Gurss, Wilkes, Artis, Hedrick & Lane, Washington, DC, for intervenor-respondent Program Producers and Distributors Committee.

Ian D. Volner, J. Brian DeBoice, Cohn & Marks, Washington, DC, for intervenor-respondent King World Productions, Inc.

James J. Popham, Ass'n of Independent Television Stations, Inc., Washington, DC, for intervenor-respondent Ass'n of Independent Television Stations, Inc.

Charles J. Sennet, David D. Hiller, Tribune Co., Chicago, IL, for intervenor-respondent Tribune Broadcasting Co.

George H. Shapiro (argued), Marilyn D. Sonn, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, for intervenors-respondents Chris Craft Television, Inc. and United Television, Inc.

Robert J. Bates, Jr., Pope & John, Chicago, IL, for intervenor-respondent Channel 50 TV Corp.

Richard R. Zaragoza, Fisher, Wayland, Cooper & Leader, Washington, DC, for petitioner and intervenor-respondent FBC Television Affiliates Ass'n.

Richard E. Wiley, Lawrence W. Secrest, III, James R. Bayes, Ellen O. Kaden, Mark W. Johnson, Wiley, Rein & Fielding, Washington, DC, David L. Shapiro, Cambridge, MA, for petitioner and intervenor-respondent CBS Inc.

Michael Kellogg, Michael McConnell, Mayer, Brown & Platt, Howard Monderer, Nat. Broadcasting Co., Washington, DC, Richard Cotton, Nat. Broadcasting Co., New York City, for petitioner and intervenor-respondent Nat. Broadcasting Co., Inc.

J. Roger Wollenberg, Joel Rosenbloom, Irwin M. Rappaport, Jonathan Jacob Nadler, Wilmer, Cutler & Pickering, Washington, DC, for petitioner and intervenor-respondent Capital Cities/ABC, Inc.

John P. Cole, Jr., Cole, Raywid & Braverman, Washington, DC, for amicus curiae Media Institute.

William N. Farabaugh, Edward A. Chapleau, Farabaugh & Chapleau, South Bend, IN, for petitioner Schurz Communications, Inc.

Diane S. Killory (argued), Linda Calhoun, Susan H. Crandall, Morrison & Foerster, Michael R. Gardner, Steven S. Rosenthal, Morrison & Foerster, Washington, DC, for petitioner and intervenor-respondent Coalition to Preserve the Financial Interest and Syndication Rule.

John D. Lane, Ramsey L. Woodworth, Robert M. Gurss, Wilkes, Artis, Hedrick & Lane, Washington, DC, for intervenor-respondent Program Producers and Distributors Committee.

William S. Reyner, Jr. (argued), Mace J. Rosenstein, Hogan & Hartson, Washington, DC, for petitioner Fox Broadcasting Co.

Andrew J. Schwartzman, Gigi B. Sohn, Media Access Project, Washington, DC, for petitioner Ariz. Consumers Council.

Before BAUER, Chief Judge, POSNER, Circuit Judge, and FAIRCHILD, Senior Circuit Judge.

POSNER, Circuit Judge.

In 1970 the Federal Communications Commission adopted "financial interest and syndication" rules designed to limit the power of the then three television networks—CBS, NBC, and ABC—over television programming. 47 C.F.R. § 73.658(j) (1990); see *Network Television Broadcasting*, 23 F.C.C.2d 382, 387 (1970), aff'd under the name of *Mt. Mansfield Television, Inc. v. FCC*, 442 F.2d 470 (2d Cir.1971). Each of the three networks consisted (as they still do) of several television stations, in key markets, owned and operated by the network itself, plus about two hundred independently owned stations electronically connected to the network by cable or satellite. In exchange for a fee paid them by the network, these affiliated stations broadcast programs that the network transmits to them, as well as to its owned and operated stations, over the interconnect system. The networking of programs intended for the early evening hours that are the "prime time" for adult television viewing gives advertisers access to a huge number of American households simultaneously, which in turn enables the networks to charge the high prices for advertising time that are necessary to defray the cost of obtaining the programming most desired by television viewers.

The financial interest and syndication rules adopted in 1970 forbade a network to syndicate (license) programs produced by the network for rebroadcast by independent television stations—that is, stations that were not owned by or affiliated with the network—or to purchase syndication rights to programs that it·obtained from outside producers, or otherwise to obtain a financial stake in such programs. If the network itself had produced the program it could sell syndication rights to an independent syndicator but it could not retain an interest in the syndicator's revenues or profits.

Many syndicated programs are reruns, broadcast by independent stations, of successful comedy or dramatic series first shown on network television. Very few series are sufficiently successful in their initial run to be candidates for syndication. Independent stations like to air five episodes each week of a rerun series that originally had aired only once a week or less, so unless a series has a first run of several years—which few series do—it will not generate enough episodes to sustain a rerun of reasonable length. The financial interest and syndication rules thus severely limited the networks' involvement in supplying television programs other than for their own or their affiliated stations.

The concern behind the rules was that the networks, controlling as they did through their owned and operated stations and their affiliates a large part of the system for distributing television programs to American households, would unless restrained use this control to seize a dominating position in the production of television programs. That is, they would lever their distribution "monopoly" into a production "monopoly." They would, for example, refuse to buy programs for network distribution unless the producers agreed to surrender their syndication rights to the network. For once the networks controlled those rights, the access of independent television stations, that is, stations not owned by or affiliated with one of the networks, to reruns would be at the sufferance of the networks, owners of a competing system of distribution. Market power in buying has the same misallocative effects as the more common market power in selling. The relation is especially close in this case because the networks can just as well be viewed as sellers of a distribution service as they can be as buyers of programs—the less they pay for programs, the more in effect they charge for distributing them.

The Commission hoped the rules would strengthen an alternative source of supply (to the networks) for independent stations—the alternative consisting of television producers not owned by networks. The rules would do this by curtailing the ability of the networks to supply the program market represented by the indepen-

dent stations, and by protecting the producers for that market against being pressured into giving up potentially valuable syndication rights. And the rules would strengthen the independent stations (and so derivatively the outside producers, for whom the independent stations were an important market along with the networks themselves) by securing them against having to purchase reruns from their competitors the networks.

The basis for this concern that the networks, octopus-like, would use their position in distribution to take over programming, and would use the resulting control of programming to eliminate their remaining competition in distribution, was never very clear. If the networks insisted on buying syndication rights along with the right to exhibit a program on the network itself, they would be paying more for their programming. (So one is not surprised that in the decade before the rules were adopted, the networks had acquired syndication rights to no more than 35 percent of their prime-time series, although they had acquired a stake in the syndicator's profits in a considerably higher percentage of cases.) If the networks then turned around and refused to syndicate independent stations, they would be getting nothing in return for the money they had laid out for syndication rights except a longshot chance—incidentally, illegal under the antitrust laws—to weaken the already weak competitors of network stations. Nor was it clear just how the financial interest and syndication rules would scotch the networks' nefarious schemes. If forbidden to buy syndication rights, networks would pay less for programs, so the outside producers would not come out clear winners—indeed many would be losers. Production for television is a highly risky undertaking, like wildcat drilling for gas and oil. Most television entertainment programs are money losers. The losses are offset by the occasional hit that makes it into syndication after completing a long first run. The sale of syndication rights to a network would enable a producer to shift risk to a larger, more diversified entity presumptively better able to bear it. The

resulting reduction in the risks of production would encourage new entry into production and thus give the independent stations a more competitive supply of programs. Evidence introduced in this proceeding showed that, consistent with this speculation, networks in the pre–1970 era were more likely to purchase syndication rights from small producers than from large ones.

Whatever the pros and cons of the original financial interest and syndication rules, in the years since they were promulgated the structure of the television industry has changed profoundly. The three networks have lost ground, primarily as a result of the expansion of cable television, which now reaches 60 percent of American homes, and videocassette recorders, now found in 70 percent of American homes. Today each of the three networks buys only 7 percent of the total video and film programming sold each year, which is roughly a third of the percentage in 1970. (The inclusion of films in the relevant market is appropriate because videocassettes enable home viewers to substitute a film for a television program.) And each commands only about 12 percent of total television advertising revenues. Where in 1970 the networks had 90 percent of the prime-time audience, today they have 62 percent, and competition among as well as with the three networks is fierce. They are, moreover, challenged today by a fourth network, the Fox Broadcasting Corporation, which emerged in the late 1980s.

Notwithstanding the fourth network, which might have been expected to reduce the number of independent stations by converting many of them to network—Fox network—stations, the number of independent stations has increased fivefold since 1970. At the same time, contrary to the intention behind the rules yet an expectable result of them because they made television production a riskier business, the production of prime-time programming has become more concentrated. There are 40 percent fewer producers of prime-time programming today than there were two decades ago. And the share of that programming accounted

for directly or indirectly by the eight largest producers, primarily Hollywood studios—companies large enough to bear the increased risk resulting from the Commission's prohibition against the sale of syndication rights to networks—has risen from 50 percent to 70 percent.

The original rules had been supported by the Antitrust Division of the Department of Justice. But as the years passed, antitrust thinking changed. The "leverage" theory, which taught that a firm having economic power in one market would use it to acquire a monopoly of another market, was widely discredited. The evolution of the television industry, sketched above, suggested that the rules, if they were having any effect at all, were working perversely from a competitive standpoint. An extensive staff study ordered by the Commission concluded that the rules were obsolete and recommended that they be abandoned. *Final Report of Network Inquiry Special Staff* (1980). In 1983 the Commission issued a tentative decision agreeing with the staff, proposing radical revisions in the rules leading to their eventual repeal, but inviting further public comments on the details of its proposals. *Tentative Decision and Request for Further Comments in Docket 82–345,* 94 F.C.C.2d 1019 (1983). The networks, the Commission found in the tentative decision, had lost any significant monopoly or market power that they may once have had. The financial interest and syndication rules were hampering the entry of new firms into production by blocking an important mechanism (the sale of syndication rights) by which new firms might have shifted the extraordinary risks of their undertaking to the networks.

Mainly as a result of congressional pressure, *Hearings before the Subcomm. on Communications of the S. Comm. on Commerce, Science & Transportation on S. 1707,* 98th Cong., 1st Sess. 6, 9 (1984); Henry M. Sooshan III & Erwin G. Krasnow, "New Checks, Balances Affect FCC Policymaking," *Legal Times,* April 8, 1985, at p. 12, there was no follow-up to the tentative decision. The question what to do about the rules remained in limbo until

1990, when the Commission at the request of the Fox network initiated a fresh notice-and-comment rulemaking proceeding. After receiving voluminous submissions from the various segments of the television industry, the Commission held a one-day hearing, after which it issued an opinion, over dissents by two of the five commissioners, including the chairman, promulgating a revised set of financial interest and syndication rules. *In re Evaluation of the Syndication and Financial Interest Rules,* 56 Fed.Reg. 26242 (May 29, 1991), on reconsideration, 56 Fed.Reg. 64207 (Nov. 22, 1991). The new rules (published at 47 C.F.R. §§ 73.658(k), 73.659–73.662, 73.3526(a)(11) (1991)) are different from the old and also more complicated. They define "network" as an entity that supplies at least 15 hours of prime-time programming to interconnected affiliates. They take off all restrictions on nonentertainment programming (that is, news and sports), and most restrictions on nonprime-time programming and on syndication for the foreign as distinct from the domestic market. But in a provision that has no counterpart in the old rules, the new ones provide that no more than 40 percent of a network's own prime-time entertainment schedule may consist of programs produced by the network itself. The new rules unlike the old permit a network to buy domestic syndication rights from outside producers of prime-time entertainment programming—provided, however, that the network does so pursuant to separate negotiations begun at least 30 days after the network and the producer have agreed on the fee for licensing the network to exhibit the program on the network itself. Even then the network may not do the actual syndication; that is, it may not arrange for the distribution of the programming to the independent stations; it must hire an independent syndicator for that. And it may acquire syndication rights only in reruns, not in first-run programs, and thus it may not distribute first-run programming other than to its network stations. This restriction applies to foreign as well as to domestic syndication unless the program is not intended for

exhibition in the U.S. at all. There is more to the new rules—there are provisions designed to prevent networks from discriminating in program supply in favor of their affiliates—but our summary will suffice to indicate the character of the rules.

The Commission's majority opinion describes them as "deregulatory," arguing that they expand the networks' opportunities to participate in the program market and promising to reexamine them in four years to see whether a further relaxation of restrictions might then be justifiable. Although the Commission conceded that the networks may already have lost so much of their market power as no longer to pose a threat to competition as it is understood in antitrust law, it concluded that some restrictions remain necessary to assure adequate diversity of television programming. The Commission's chairman, understandably irate because the majority had ignored most of the points in his long and detailed dissent, predicted that the majority's decision would "produce a milestone case on what constitutes arbitrary and capricious decisionmaking."

The new rules were not stayed, and became effective in May of last year. The networks have petitioned this court to invalidate them as arbitrary and capricious. 5 U.S.C. § 706(2)(A). They argue that the only administrative order supportable by the record compiled by the Commission would be a total repeal of the 1970 rules. Coalitions of producers and of independent stations have also filed petitions for review, arguing, though halfheartedly—for on the whole they are content with the new rules—that the Commission should have left the original rules intact.

The Communications Act of 1934, 47 U.S.C. § 151 *et seq.*, gives the Federal Communications Commission authority over the use of the electromagnetic spectrum to propagate communications signals. With the blessing of the Supreme Court the Commission has used this authority, in much the same fashion that it accuses the networks of wanting to use leverage in the distribution market to gain a stranglehold over programming, to regulate activities by networks that are remote from the concerns with signal interference that first summoned federal regulation of the airwaves into being. The handle is the Commission's control over broadcast licenses, including those held by the networks' owned and operated stations. The Commission has been allowed to condition the renewal of those licenses on the networks' accepting constraints intended to maximize the Commission's conception of the social benefits of broadcasting. *National Broadcasting Co. v. United States,* 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed.1344 (1943). The statute provides no guidance for the exercise of this authority other than that the Commission is to act in accordance with the public interest, convenience, or necessity. *Id.* at 215, 63 S.Ct. at 1009; 47 U.S.C. § 303; *FCC v. WNCN Listeners Guild,* 450 U.S. 582, 593–94, 101 S.Ct. 1266, 1273, 67 L.Ed.2d 521 (1981); *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 810, 98 S.Ct. 2096, 2119–20, 56 L.Ed.2d 697 (1978). So nebulous a mandate invests the Commission with an enormous discretion and correspondingly limits the practical scope of responsible judicial review. The nature of the record compiled in a notice-and-comment rulemaking proceeding—voluminous, largely self-serving commentary uncabined by any principles of reliability, let alone by the rules of evidence—further enlarges the Commission's discretion and further diminishes the capacity of the reviewing court to question the Commission's judgment. Cf. *Morales v. Yeutter,* 952 F.2d 954, 958 (7th Cir.1991).

Although the television industry is less complex than some and its product is well known even to federal judges, there are more than enough technical aspects to the industry, involving such things as the modes of financing and contracting and the effects of market structure and practices on television fare, to enforce judicial diffidence. Moreover, economists do not agree on the relation between monopoly or competition, on the one hand, and the quality or variety of an industry's output, on the other, so that it is difficult to obtain a theoretical perspective from which to evaluate the Commission's claims about that relation.

If the Commission were enforcing the antitrust laws, it would not be allowed to trade off a reduction in competition against an increase in an intangible known as "diversity." Since it is enforcing the nebulous public interest standard instead, it is permitted, and maybe even required, to make such a tradeoff—at least we do not understand any of the parties to question the Commission's authority to do so. And although as an original matter one might doubt that the First Amendment authorized the government to regulate so important a part of the marketplace in ideas and opinions as television broadcasting, the Supreme Court has consistently taken a different view. *FCC v. National Citizens Committee for Broadcasting, supra; FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978); *National Broadcasting Co. v. United States, supra,* 319 U.S. at 226–27, 63 S.Ct. at 1014. The challenged rules themselves, finally, are so complicated that it is unclear whether they are more or less restrictive than the rules they modified.

From what we have said so far, it should be apparent that the networks have no hope of proving to our satisfaction that the Commission is without *any* power to restrict the networks' participation in television programming. Even if we were persuaded that it would be irrational to impute to the networks even a smidgen of market power, the Commission could always take the position that it should carve out a portion of the production and distribution markets and protect them against the competition of the networks in order to foster, albeit at a higher cost to advertisers and ultimately to consumers, a diversity of programming sources and outlets that might result in a greater variety of perspectives and imagined forms of life than the free market would provide. That would be a judgment within the Commission's power to make.

█ The difficult question presented by the petitions to review is not whether the Commission is authorized to restrict the networks' participation in program production and distribution. It is whether the Commission has said enough to justify, in the face of the objections lodged with it, the particular restrictions that it imposed in the order here challenged. One might be tempted as an original matter to treat an administrative rule as courts treat legislation claimed to deny substantive due process, and thus ask whether on any set of hypothesized facts, whether or not mentioned in the statement accompanying the rule, the rule was rational. *United States v. Carolene Products Co.,* 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938); *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 487–88, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1955); *Central States, Southeast & Southwest Areas Pension Fund v. Lady Baltimore Foods, Inc.,* 960 F.2d 1339, 1343 (7th Cir.1992). And then the new financial interest and syndication rules would have to be upheld. But that is not the standard for judicial review of administrative action. It is not enough that a rule might be rational; the statement accompanying its promulgation must show that it is rational—must demonstrate that a reasonable person upon consideration of all the points urged pro and con the rule would conclude that it was a reasonable response to a problem that the agency was charged with solving. *Bowen v. American Hospital Ass'n,* 476 U.S. 610, 626–27, 106 S.Ct. 2101, 2112, 90 L.Ed.2d 584 (1986) (plurality opinion); *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983); *SEC v. Chenery Corp.,* 318 U.S. 80, 87–88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943); *International Union, UAW v. NLRB,* 802 F.2d 969, 972 (7th Cir.1986); *Wong Wing Hang v. INS,* 360 F.2d 715, 719 (2d Cir.1966) (Friendly, J.). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co., supra,* 463 U.S. at 43, 103 S.Ct. at 2867, quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962).

The new rules flunk this test. The Commission's articulation of its grounds is not adequately reasoned. Key concepts are left unexplained, key evidence is overlooked, arguments that formerly persuaded the Commission and that time has only strengthened are ignored, contradictions within and among Commission decisions are passed over in silence. The impression created is of unprincipled compromises of Rube Goldberg complexity among contending interest groups viewed merely as clamoring suppliants who have somehow to be conciliated. The Commission said that it had been "confronted by alternative views of the television programming world so starkly and fundamentally at odds with each other that they virtually defy *reconciliation*" (emphasis added). The possibility of resolving a conflict in favor of the party with the stronger case, as distinct from throwing up one's hands and splitting the difference, was overlooked. The opinion contains much talk but no demonstration of expertise, and a good deal of handwringing over the need for prudence and the desirability of avoiding "convulsive" regulatory reform, yet these unquestioned goods are never related to the particulars of the rules—rules that could have a substantial impact on an industry that permeates the daily life of this nation and helps shape, for good or ill, our culture and our politics. The Commission must do better in articulating their justification. Perhaps the attempt to do so will result in significant modifications in the rules. Not all remands result in the reinstatement of the original decision with merely a more polished rationalization. *Graphic Communications Int'l Union v. NLRB*, 977 F.2d 1168 (7th Cir.1992).

The Commission's majority opinion (in which we include its opinion on reconsideration) is long, but much of it consists of boilerplate, the recitation of the multitudinous parties' multifarious contentions, and self-congratulatory rhetoric about how careful and thoughtful and measured and balanced the majority has been in evaluating those contentions and carrying out its responsibilities. Stripped of verbiage, the opinion, like a Persian cat with its fur shaved, is alarmingly pale and thin. It can be paraphrased as follows. The television industry has changed since 1970. There is more competition—cable television, the new network, etc. No longer is it clear that the networks have market power in an antitrust sense, which they could use to whipsaw the independent producers and strangle the independent stations. So there should be some "deregulation" of programming—some movement away from the 1970 rules. But not too much, because even in their decline the networks may retain some power to extort programs or program rights from producers. The networks offer advertisers access to 98 percent of American households; no competing system for the distribution of television programming can offer as much. Anyway the Commission's concern, acknowledged to be legitimate, is not just with market power in an antitrust sense but with diversity, and diversity is promoted by measures to assure a critical mass of outside producers and independent stations. So the networks must continue to be restricted—but less so than by the 1970 rules. The new rules will give the networks a greater opportunity to participate in programming than the old ones did, while protecting outside producers and independent stations from too much network competition.

All this is, on its face, plausible enough, but it is plausible only because the Commission, ostrich fashion, did not discuss the most substantial objections to its approach, though the objections were argued vigorously to it, by its own chairman among others. To begin with, the networks object that the new rules do not in fact increase their access to the programming market and may decrease it, in the face of the Commission's stated objective. The 40 percent limitation on the amount of prime-time entertainment that a network can supply from its in-house production is a new restriction on the networks, having no counterpart in the original rules. It does have a counterpart in consent decrees that the networks entered into some years ago, e.g., *United States v. National Broadcasting Co.*, 449 F.Supp. 1127 (C.D.Cal.1978), when

the Justice Department was still enamored of the leverage theory, but those decrees expired two years ago. The carving out of nonentertainment programming from the restrictions imposed by the new rules is a throwaway, because there is no syndication market for news and sports programs. Also illusory, the networks argue, is the newly granted right to acquire syndication rights from outside producers, given the restrictions with which the new right is hedged about. A producer cannot wait until 30 days after negotiating the network license fee to sell off syndication rights, because the sale of those rights, the networks contend, is critical to obtaining the financing necessary to produce the program in the first place. These arguments may be right or wrong; our point is only that the Commission did not mention them. We are left in the dark about the grounds for its belief that the new rules will give the networks real, not imaginary, new opportunities in programming.

The new rules, like their predecessors, appear to harm rather than to help outside producers *as a whole* (a vital qualification) by reducing their bargaining options. It is difficult to see how taking away a part of a seller's market could help the seller. One of the rights in the bundle of rights that constitutes the ownership of a television program is the right to syndicate the program to nonnetwork stations. The new rules restrict—perhaps, as a practical matter, prevent—the sale of that right to networks. How could it help a producer to be *forbidden* to sell his wares to a class of buyers that may be the high bidders for them? It is not as if anyone supposed that syndication rights, like babies or human freedom or the vital organs of a living person, should not be salable at all. They are freely salable—except to networks. Since syndication is the riskiest component of a producer's property right—for its value depends on the distinctly low-probability event that the program will be a smash hit on network television—restricting its sale bears most heavily on the smallest, the weakest, the newest, the most experimental producers, for they are likely to be the ones least able to bear risk. It becomes

understandable why the existing producers support the financial interest and syndication rules: the rules protect these producers against new competition both from the networks (because of the 40 percent cap) and from new producers. The ranks of the outside producers of prime-time programming have been thinned under the regime of financial interest and syndication rules. The survivors are the beneficiaries of the thinning. They do not want the forest restored to its pristine density. They consent to have their own right to sell syndication rights curtailed as the price of a like restriction on their potential competitors, on whom it is likely to bear more heavily.

This analysis of risk and its bearing on competition in the program industry is speculative, theoretical, and may for all we know be all wet—though it is corroborated by the increasing concentration of the production industry since the rules restricting the sale of syndication rights were first imposed in 1970. The Commission was not required to buy the analysis. But as the analysis was more than plausible and had been pressed upon it by a number of participants in the rulemaking proceeding—including a putatively disinterested Justice Department that in the past had frequently seen the bogeyman of monopoly lurking everywhere, as well as the Commission's own chairman—the Commission majority was not entitled to ignore it. Not even to consider the possibility that the unrestricted sale of syndication rights to networks would strengthen the production industry (the industry—not necessarily its present occupants) and thereby increase programming diversity by enabling a sharing between fledgling producers and the networks of the risks of new production was irresponsible. For if the argument about risk sharing is correct, the rules are perverse; by discouraging the entry of new producers into the high-risk prime-time entertainment market, they are likely to reduce the supply of programs to the independent stations and so reduce diversity both of program sources and of program outlets. The Commission's stated desiderata are competition and diversity. The rules

adopted by the Commission in order to achieve these desiderata have the remarkable property—if the risk-sharing argument that the Commission did not deign to address is correct—of disserving them both.

Central to the Commission's decision to continue restricting the networks' participation in programming is its belief that whether or not they have market power in some antitrust sense they have the power to force producers to sell them programs for less than the programs would be worth in a fully competitive market. The networks call this a contradiction: either they have market power, or they don't; there is no middle ground. A rational commission could disagree. Market power is a matter of degree. Some firms have a lot of it, some a little, some none. It is plausible that each network, even when not colluding with the others (there is no evidence that they are colluding), has some market power and thus can drive a harder bargain with producers than it could do if it had none. Even though each of the three major networks has only about 20 percent of the prime-time audience and a producer who does not sell his program to a network can still hope to distribute it to the public via independent stations and cable networks, or for that matter movie theaters and videocassette dealers, network distribution offers advertisers unique simultaneous access to a large fraction of American households and increases the prospects for successful syndication, which apparently is where the real money in the creation of television entertainment is to be made.

The difficulty is that if the networks do have market power, the new rules (in this respect like the old) do not seem rationally designed to prevent its exercise. A rule telling a person he may not do business with some firm believed to have market power is unlikely to make the person better off. Suppose that in a competitive market a network would pay $2 million for first-run rights to some program and $1 million for syndication rights, for a total of $3 million, but that because of the lack of perfect substitutes for using this network to distribute his program the producer is willing to sell each of these rights to the network for half their competitive-market value (i.e., for $1 million and $500,000 respectively). The producer is made no better off by being forbidden to sell the syndication rights to the network. He gets the same meager first-run license fee ($1 million) and now must cast about for another buyer for the syndication rights. That other buyer is unlikely to pay more than the network would ($500,000); otherwise the producer would have sold the syndication rights to him in the first place. It is no answer that the network would not have given the producer the option of selling it only first-run rights, that it would have insisted on the whole package so that it could control the program supply of the independent stations, which are heavily dependent on reruns and hence on syndication. The producer might indeed be desperate for network distribution, but that desperation would be reflected in the low price at which he was willing to sell the network whatever rights the network wanted. He cannot do better by being forbidden to make such a deal. If he could do better by selling syndication rights to someone else he would not accede to such unfavorable terms as the network offered.

If this is right, the new rules, at least insofar as they restrict network syndication, cannot increase the prices that producers receive. All they can do is increase the costs of production by denying producers the right to share risks with networks.

To this the Commission might (though did not) reply by pointing to the movement for artists' rights statutes. Cal.Civ.Code § 986(a). Such statutes reserve to an artist a royalty on future sales of his art. They thus force the artist to retain a counterpart to syndication rights. The only intelligible rationale for tying the artist's hands in this way is that artists may be financially unsophisticated and hence at the mercy of crafty, rapacious dealers. No one supposes that producers of television programs are financially unsophisticated. The rationale for the Commission's producers' rights statute is left unilluminated.

*Everything* that we have said about the effect of forbidding producers to sell syndi-

cation rights to networks may be wrong. That we freely grant. But the argument we have sketched—an argument vigorously pressed upon the Commission by the networks—is sufficiently persuasive to have placed a burden of explanation on the Commission. It did not carry the burden. It did not mention the objection.

And we have said nothing as yet of the treatment of the Fox network. That network is built around the production capability and film library of Twentieth Century Fox. At present the network supplies only 12 to 14 hours a week of prime-time programming to its owned and affiliated stations and is therefore exempt from the new rules. Should it reach 15 hours, however, it would be subject to them. Fox argues that, given the importance of program production in its overall corporate activity, the effect of the rules is to limit it to supplying fewer than 15 hours of prime-time programming and therefore to limit its growth as a network. Corroboration of this argument is found in the fact that the Fox network hit 15 hours a week shortly before the rules went into effect, then cut back to the present 12 to 14 hours. By limiting Fox in this way the new financial interest and syndication rules limit competition with the major networks and thus entrench the market power that is the rules' principal rationale. Or so Fox argues; it may be bluffing; maybe the effect of the rules will be to induce Fox to divest its production or network arms, so that the network can grow without constraining Fox's production activities. But once again the Commission failed even to mention the argument that its rules perversely limit competition with the established networks.

More than competition in the economic sense is at stake. Fox's affiliates are for the most part the traditionally weak UHF stations. They do not consider themselves "network" stations in the same sense that a CBS or NBC or ABC affiliate does. Many of them are members of the trade association of independent television stations. Anything that weakens Fox's incentives to furnish prime-time programming weakens them, contrary to the Commission's desire, protectionist though it may

be, to strengthen independent stations. This perverse consequence of the rules also went unmentioned.

 The Commission's treatment of precedent was also cavalier. An administrative agency is no more straitjacketed by precedent than a court is. It can reject its previous decisions. But it must explain why it is doing so. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co., supra; Illinois Bell Tel. Co. v. FCC,* 740 F.2d 465, 470–71 (7th Cir.1984); *Continental Web Press, Inc. v. NLRB,* 742 F.2d 1087, 1093–94 (7th Cir.1984). This is an aspect of the duty mentioned earlier of rational explanation; a rational person acts consistently, and therefore changes course only if something has changed. In 1983, in its tentative decision, the Commission rejected the proposition that the networks had significant market power, found that the financial interest and syndication rules were preventing efficient risk-sharing, and concluded that the rules should be phased out by 1990. *Tentative Decision and Request for Further Comments in Docket 82–345, supra,* 94 F.C.C.2d at 1063–71, 1101. In the eight years between that decision and the one under review the networks lost still more ground, with the continued rapid growth of cable television and the advent of the Fox network. The Commission majority cited the tentative decision but did not discuss it—did not explain what had happened in eight years to justify the Commission's about face or, if nothing had happened, why the tentative decision had been wrong from the start. The tentative decision had also laid down a general approach to the evaluation of network restrictions: "the Commission should not intervene in the market except where there is evidence of a market failure and a regulatory solution is available that is likely to improve the net welfare of the consuming public." *Id.* at 1055. That standard went unremarked in the present order.

It is no answer that the 1983 decision had been tentative, and specifically that the Commission had not promulgated a remedy—had not actually abrogated the rules that it had found had outlived their useful-

ness. The Supreme Court's first decision in *Brown v. Board of Education,* which held that public school segregation was unconstitutional, was not deprived of precedential status by the fact that the Court postponed the issuance of a remedial decree to a subsequent decision. There was nothing tentative about the Commission's conclusion in the 1983 decision that the networks had lost their market power and that the financial interest and syndication rules were unsound and should be phased out. It said, "we are confident that our analysis of the effect of the rules in terms of the network/supplier relationship is correct." 94 F.C.C.2d at 1101. It was unsure only about "the mechanical aspects of whatever form of regulation" was adopted in lieu of the old rules, pending complete repeal in 1990. *Id.*

We remarked earlier that even if the networks had zero market power, the Commission might in the discharge of its undefined, uncanalized responsibility to promote the public interest restrict the networks' programming activities in order to create a more diverse programming fare. What it could not do, consistent with the principles of reasoned decision-making, was pretend that it had never found that the networks had lost market power. Imagine just the purely *professional* criticism to which the Supreme Court would have been subjected if in the second *Brown* decision, without so much as discussing the first decision, it had held that public school segregation was constitutional after all.

Finally, while the word diversity appears with incantatory frequency in the Commission's opinion, it is never defined. At argument one of the counsel helpfully distinguished between source diversity and outlet diversity (as had the Commission itself in previous decisions—including *Tentative Decision and Request for Further Comments in Docket 82–345, supra,* 94 F.C.C.2d at 1054). The former refers to programming sources, that is, producers, and the latter to distribution outlets, that is, television stations. The two forms of diversity are related because the station decides what programs to air and therefore affects producers' decisions about what to produce. A third and one might suppose the critical form of diversity is diversity in the programming itself; here "diversity" refers to the variety or heterogeneity of programs. The Commission neither distinguished among the types of diversity nor explained the interrelation among them. As it is very difficult to see how sheer *number* of producers or outlets could be thought a good thing—and anyway the rules seem calculated, however unwittingly, to decrease, or at least to freeze, but certainly not to increase, the number of producers—we assume that the Commission thinks of source diversity and outlet diversity as means to the end of programming diversity.

Are they? It has long been understood that monopoly in broadcasting could actually promote rather than retard programming diversity. If all the television channels in a particular market were owned by a single firm, its optimal programming strategy would be to put on a sufficiently varied menu of programs in each time slot to appeal to every substantial group of potential television viewers in the market, not just the largest group. For that would be the strategy that maximized the size of the station's audience. Suppose, as a simple example, that there were only two television broadcast frequencies (and no cable television), and that 90 percent of the viewers in the market wanted to watch comedy from 7 to 8 p.m. and 10 percent wanted to watch ballet. The monopolist would broadcast comedy over one frequency and ballet over the other, and thus gain 100 percent of the potential audience. If the frequencies were licensed to two competing firms, each firm would broadcast comedy in the 7 to 8 p.m. time slot, because its expected audience share would be 45 percent (one half of 90 percent), which is greater than 10 percent. Each prime-time slot would be filled with "popular" programming targeted on the median viewer, and minority tastes would go unserved. Some critics of television believe that this is a fair description of prime-time network television. Each network vies to put on the most popu-

lar programs and as a result minority tastes are ill served.

Well, so what? Almost everyone in this country either now has or soon will have cable television with 50 or 100 or even 200 different channels to choose among. With that many channels, programming for small audiences with specialized tastes becomes entirely feasible. It would not have been surprising, therefore, if the Commission had taken the position that diversity in prime-time television programming, or indeed in over-the-air broadcasting generally, was no longer a value worth promoting. It did not take that position. Instead it defended its restrictions on network participation in programming on the ground that they promote diversity. But it made no attempt to explain how they do this. It could have said, but did not, that independent television stations depend on reruns, which they would prefer to get from sources other than the networks with which they compete, and—since reruns are the antithesis of diversity—they use their revenue from reruns to support programming that enhances programming diversity. It could have said that programs produced by networks' in-house facilities are somehow more uniform than programs produced by Hollywood studios. It didn't say that either. It never drew the link between the rules, which on their face impede the production of television programs—not only by constraining negotiations between networks and outside producers but also by reducing the networks' incentive to produce by limiting the extent to which a network can exhibit its own programs in prime time—and the interest in diverse programming. The Commission may have thought the link obvious, but it is not. The rules appear to handicap the networks and by handicapping them to retard new entry into production; how all this promotes programming diversity is mysterious, and was left unexplained in the Commission's opinion.

That opinion, despite its length, is unreasoned and unreasonable, and therefore, in the jargon of judicial review of administrative action, arbitrary and capricious. The Commission's order is therefore vacated

and the matter is returned to the Commission for further proceedings. The Commission may of course reopen the record of the rulemaking proceeding to receive additional comments if that will help it reach an articulate reasoned decision.

There is one loose end. The precise form of our order could be important. The Commission's order both adopted new rules and vacated the old ones, the 1970 rules. If we simply vacate the order, this would seem to imply that the old rules—which the Commission itself believes outmoded—would spring back into effect. One of the networks therefore asks us to leave undisturbed the portion of the Commission's order that vacates the old rules. The other parties have not addressed this issue. It could be important because the Commission may take some time to determine its further course in light of our order. We have therefore decided to stay our order for 30 days to give the parties an opportunity to submit supplementary briefs on the question of its exact scope and terms. Briefs are due within 15 days of today and shall be limited to 10 pages in length; parties aligned on the same side of the case are urged to file a joint brief.

VACATED.

## SUPPLEMENTAL PROCEEDING ON REMEDY.

### December 7, 1992

■ Last month we vacated the FCC's new financial interest and syndication rules but stayed our order to consider a perplexing remedial question, ignored by all but one of the parties, arising from the form of the Commission's order that we were vacating. *Schurz Communications, Inc. v. FCC*, 982 F.2d 1043, 1055 (7th Cir.1992). The Commission's order had done two things: repealed the 1970 "finsyn" rules, and promulgated new rules. If we simply vacated the order, because the new rules were (as we had found) arbitrary and capricious, the effect would be to vacate also the part of the order repealing the 1970 rules. Those rules would spring back into effect. Yet no party to the proceeding in this court had defended the old rules (we

thought one had, but were wrong). Such an order would therefore make everyone worse off during the period in which the Commission was deciding what to do in response to our decision. We therefore asked the parties to file supplemental briefs advising us as to the best course to follow in this unusual situation. The briefs have now been filed, and, no party having requested oral argument, we proceed to decision.

There are five possibilities. We can—

1. Simply vacate the Commission's order, even though one consequence would be that the 1970 rules would come back into effect;

2. Vacate everything in the Commission's order except the repeal of the 1970 rules, so that until the Commission acted there would be no restrictions on the networks' activities in the production and distribution of television programs;

3. Issue no order vacating the rules, but simply remand the matter to the Commission for further proceedings, during which the present rules would remain in effect;

4. Vacate the Commission's order in its entirety but stay our order for a fixed period of time, after which it would take effect automatically unless further stayed;

5. Vacate everything in the Commission's order except the repeal of the 1970 rules, but, again, stay our order for a fixed period of time.

The parties appear to agree that which form of order we adopt is a matter within our discretion, though of course not a discretion to be exercised arbitrarily. Cf. *International Union v. Federal Mine, Safety & Health Administration*, 920 F.2d 960, 966–67 (D.C.Cir.1990).

Option 1 is out of the question. Not only does no one defend the old rules, but the Fox network has reasonably relied on their demise to the extent of increasing the amount of programming that it supplies its affiliates above the level permitted by the old rules. Even the coalition of outside producers and independent stations that is the most vigorous proponent of restricting network participation in programming accepts the appropriateness of remanding the case to the Commission in lieu of vacating the Commission's order in its entirety and thus restoring the old rules.

Option 2 is also unreasonable. It would leave the networks free of any restrictions at all, even though all we held in our decision of November 5 was that the Commission had failed to offer a reasoned justification for the new rules. The networks argue in support of 2 that, given current conditions in the industry, no such justification is possible for *any* restrictions on the networks' programming activities. This remains to be seen. It is not as if we had held that the Commission had no power to place restrictions on competition by networks. Its power to do so is, in fact, unquestioned. The likelihood that some set of restrictions, similar or conceivably even identical to those invalidated on November 5, will survive judicial review cannot be considered so slight that the proper interim regime would be one without any restrictions at all. *Addison v. Holly Hill Fruit Products, Inc.*, 322 U.S. 607, 618–19, 64 S.Ct. 1215, 1221–22, 88 L.Ed. 1488 (1944); *North Carolina v. FERC*, 730 F.2d 790, 796–97 (D.C.Cir.1984).

Option 3—remanding the case with no limitation of time—is unacceptable because of the Commission's history of procrastination in dealing with the "finsyn" issue. Back in 1983 the Commission found that the 1970 rules were obsolete and should be abrogated, *Tentative Decision and Request for Further Comments in Docket 82–345*, 94 F.C.C.2d 1019, 1063–71, 1101 (1983), but it was not until 1990 that it began to consider new rules to replace them. The Commission has been worrying the issue of what production and distribution restrictions (if any) to place on the networks for more than twenty years. We have no assurance that it would not take another decade to mull over its response to our decision of November 5—meanwhile enforcing rules that we have found to be unlawful.

In these circumstances our only defensible choice is between options 4 and 5, which

differ only in the consequence should the Commission not act within the period of time that we fix. Under 4, the consequence would be that the old rules would spring into effect; under 5, that there would be no rules. The second is preferable. We are supposing a situation in which even after the Commission has had a reasonable time to formulate new or modified rules or a new justification for the current rules (that is, the rules adopted in 1991), it is unable to come up with *anything.* Such a default would support the networks' argument that there is no rational basis for continuing to impose any restrictions on them.

The remaining question is the precise length of the deadline. In *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 87–88, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598 (1982), the Court gave Congress three months to enact a new bankruptcy statute, pending which the existing bankruptcy courts, which the Supreme Court had found to be unconstitutional, were allowed to continue in operation. In *Board of Trade v. SEC,* 883 F.2d 525, 536–37 (7th Cir.1989), a panel of this court imposed a slightly longer (120–day) stay of a judgment invalidating an administrative regulation. We think the longer period ample in this case. Should the FCC decide not to attempt merely to "rejustify" the existing rules, but to draft new rules, it could meet the deadline by taking 30 days to rewrite the rules, giving the interested public 45 days to submit its comments, taking 15 days to reexamine and if necessary revise its proposed rules in light of the public comments, and publishing the rules 30 days before they became effective (as the statute requires—though the period can be shortened "for good cause," 5 U.S.C. § 553(d)(3)). The schedule we have outlined may seem tight but if administrative expertise means anything, it means that after an agency has been ruminating about a problem for two decades it can act swiftly to deal with the consequences of a judicial finding that its latest regulation of the problem is unlawful. And should the Commission make substantial progress within 120 days toward a new set of rules

but not be able to complete its work, it can always ask us for a stay. The burden will then be on it, as it should be, to persuade us that despite its default the networks should not be unleashed to compete in the programming market without restrictions.

The order issued by this court on November 5 is modified to invalidate the Commission's order (and its amendment thereto) except insofar as the order abrogates the 1970 finsyn rules, and as so modified is stayed for 120 days from today. The period for asking for rehearing of either the court's original decision or today's modified order shall run from today also.