MADISON GAS & ELECTRIC
COMPANY, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,
Respondent.

CITY OF SPRINGFIELD, ILLINOIS,
CITY WATER, LIGHT and
POWER, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,
Respondent.

Nos. 93–2131, 93–2262.

United States Court of Appeals,
Seventh Circuit.

Argued April 5, 1994.

Decided May 27, 1994.

Henry V. Nickel (argued), Norman W. Fichthorn (argued), Hunton & Williams, Washington, DC, for Madison Gas & Elec. Co.

Lee M. Thomas, Lawrence J. Jensen, Gerald H. Yamada, Carol M. Browner, E.P.A. Washington, DC, Valdas V. Adamkus, E.P.A., Region 5, Office of the Regional Counsel, Chicago, IL, Jonathan C. Averback, John C. Nagle (argued), Department of Justice, Environmental Defense Section, Washington, DC, for E.P.A.

Henry V. Nickel (argued), Norman W. Fichthorn (argued), Hunton & Williams, Washington, DC, James K. Zerkle, Springfield, IL, for City of Springfield, Ill., City Water, Light and Power.

Before POSNER, Chief Judge, BAUER, Circuit Judge, and ASPEN, District Judge.[*]

POSNER, Chief Judge.

We have consolidated for argument and decision two petitions for review of an order (technically, "final action," 42 U.S.C. § 7607(b)(1)) by the Environmental Protection Agency awarding to electric utilities allowances for the emission of sulphur dioxide. *Acid Rain Allowance Allocations and Reserves,* 58 Fed.Reg. 15634, 15662, 15697 (March 23, 1993). The EPA has questioned our jurisdiction over these petitions but we rejected its view in *Madison Gas & Electric Co. v. EPA,* 4 F.3d 529 (7th Cir.1993), and have been given no reason to reexamine the issue.

In 1990 Congress added Title IV to the Clean Air Act to deal with the problem of acid rain. 42 U.S.C. §§ 7651–7651o. Under Phase II of the statutory program, the one at issue in this case, the EPA is required to award, effective in the year 2000, $SO_2$ emission allowances to each of the nation's 2,200 electric utilities. § 7651d. Each allowance permits the emission of one ton of $SO_2$ per year. The allowances can be bought and sold. § 7651b(b). This is the novel feature of the acid rain program. A market in pollution is created. Clean utilities can make money selling their excess allowances and dirty utilities that do not want to expend the resources necessary to become clean can instead buy allowances from the clean utilities.

The EPA promulgated a provisional table of allowances for public comment. Madison Gas and Electric Company and City of Springfield, Illinois, City Water, Light and Power objected to the number of allowances they had received. The EPA rejected the objections (see "EPA Response to Public Comment on Proposed Allowance Allocation Rule," March 1993, pp. 32–34 (unpublished)), which the two utilities renew with us.

■ Madison claims that it is entitled to bonus allowances because it is "a utility operating company whose aggregate nameplate fossil fuel steam-electric capacity" exceeds 250 megawatts. 42 U.S.C. §§ 7651d(c)(1), (c)(4). Whether Madison crosses the 250 MWe threshold and is therefore entitled to the bonus allowances depends on whether its aggregate capacity includes that of two electric plants of which it is a 22 percent owner. Although another utility company operates the plants, Madison is a "utility operating company" as distinct from a holding company—that much is conceded—and it argues that "whose ... capacity" means "capacity owned by." The EPA gave three reasons for rejecting Madison's interpretation: "the sentence construction clearly indicates that the aggregate capacity is that of the operating company," by which the EPA meant the company that operates the plants whose capacity is in issue; it would be infeasible to "split a unit by ownership for the allocation of allowances"; and Madison's interpretation is unworkable because ownership is reported for only the largest utilities.

That is it. Nine short sentences disposing of a claim worth about $3 million to the utility (Madison is seeking 20,540 extra allowances, and the current price of an allowance is $150). Worse, nine sentences that say little. To begin with, it is not at all clear that, as the agency believes, the statutory language refers to capacity operated rather than owned. The word "operating" appears in the relevant section only as qualifying "company" so that it will be clear that the

---

[*] Hon. Marvin E. Aspen of the Northern District of Illinois.

section does not apply to holding companies. Read naturally, the "whose" of "whose capacity" refers to the owner of the capacity. That interpretation is not inevitable but even less so is the agency's, and at argument the agency's lawyer conceded that the statutory language was ambiguous. He was right. But his client, perhaps because it mistakenly thought the language clear, had offered only threadbare reasons for resolving the ambiguity against Madison. The first was that units (meaning utility generating plants) can't be split. We are uncertain what that means or how it bears on the issue of owned versus operating capacity. The allocation, among the co-owners, of the allowances that have been allotted to the two units of which Madison is a 22 percent owner are not in issue. Madison wants *bonus* allowances for its *other* units, those of which it is sole owner. It is entitled to those bonus allowances if it can add 22 percent of the capacity of the two units of which it is a co-owner to the capacity of the units of which it is the sole owner, for the addition will put it over the 250 MWe threshold. We have no idea whether the utility that operates the units received any bonus allowances—and if it did, it would not follow that if the agency gives Madison bonus allowances it will have to change any other utility's allowances. Bonus allowances do not count against the 8.9 million allowances ceiling under Phase II. 42 U.S.C. §§ 7651b(a)(1), 7651d(a)(2). There is a separate ceiling on bonus allowances, § 7651d(a)(2), but no indication that it has been reached yet. And even if Madison's interpretation did require taking away some other utility's allowances, that would hardly be a reason for regarding its interpretation as unworkable; it would be a reason for concluding that the agency's allocation had been erroneous and should be corrected. The allowances are not even usable for another six years, so we do not understand why changing them now would cause problems.

We also fail to understand why the fact that owned as distinct from operating capacity is not listed on the form that the EPA used to create a "National Database" of information upon which to base the allocation of emission allowances for the acid-rain program should make Madison's position un-

workable. Only the largest utilities could possibly qualify for bonus allowances on the basis of aggregate capacity, and they are required to submit ownership information, albeit on a different form. More important, utilities know what they own, of course, and the EPA can impose whatever requirements of proof are necessary to prevent them from pretending to own capacity that they do not. We acknowledge the possibility that some interests may be difficult to classify as "ownership," cf. *Madison Gas & Electric Co. v. Commissioner*, 633 F.2d 512 (7th Cir.1980), but this would pose a substantial problem for the agency only if there were many utilities claiming allowances on the basis of owned rather than operated capacity and many variants on simple ownership in this industry. We have been told of only one other utility besides Madison that might be entitled to emission allowances on the basis of owned but not operated capacity—and it is not complaining about its allotment.

■ At argument the EPA's lawyer suggested another basis for the agency's position: that the operating company has the greater stake in obtaining emission allowances because it is the operating company rather than the owner that is liable for penalties for a generating unit's emitting $SO_2$ in excess of its allowances. Whether that is a good or a bad ground for the agency's decision (it seems *very* bad, because the penalty provisions impose liability on an "owner or operator," 42 U.S.C. § 7651j), it is not a ground that the agency articulated. We are therefore barred by the *Chenery* doctrine from upholding its decision on the basis of it. *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88, 63 S.Ct. 454, 458–459, 87 L.Ed. 626 (1943); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971); *Osaghae v. INS*, 942 F.2d 1160, 1163 (7th Cir.1991).

■ The issue presented by Springfield is different, but the agency's handling of it reveals the same defects as its handling of Madison's petition. Springfield wants to be classified as a utility operating company with "a total fossil fuel steam-electric generating capacity greater than 250 MWe, and less

than 450 MWe," as that will entitle it (unlike Madison, which is seeking allowances under a provision of the statute that favors large utilities rather than small ones) to more allowances than if its capacity exceeded 450 MWe. 42 U.S.C. §§ 7651d(c)(1), (c)(3). Whether Springfield is entitled to this classification depends in turn on whether "generating capacity" is defined as "name-plate capacity," the EPA's choice, or as "summer net dependable capability," as Springfield prefers. Nameplate capacity is the capacity figure stamped on a generating unit by its manufacturer and includes the capacity necessary to power the unit itself. Summer net dependable capability is net of that capacity and differs from nameplate capacity in other respects as well, so that it can be either greater or smaller but in Springfield's case it is smaller and the use of it as the measure of capacity would bring the utility under the 450 MWe ceiling. The term "generating capacity" is nowhere defined.

The agency's response was again inadequate. It first chided Springfield for not having raised the issue when the National Database was compiled. But since data on summer net dependable capacity (unlike data on owned capacity) *are* part of the National Database, this part of the agency's response falls completely flat. Next and last it observed that "there are many ways to measure capacity, not simply two—nameplate and summer net dependable. In the absence of Congressional direction on the proper measure for capacity under Section 405(c), EPA looks to other provisions in the Act and has discretion to choose a rationale [*sic* ] measure. In fact, paragraphs 405(c)(1) and (2) do specify the utility's aggregate nameplate capacity. Therefore, EPA believes that the capacity measure for Section 405(c)(3) should also be nameplate." End of analysis.

 Although the EPA is free to choose any "reasonable" interpretation for an undefined term in the statutes it administers, *Chevron USA Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 845, 866, 104 S.Ct. 2778, 2793, 2793, 81 L.Ed.2d 694 (1984), it must exhibit the reasons for its choice and those reasons must be at least plausible. As the Supreme Court has said,

the agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983), quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). Otherwise the reviewing court cannot assess the reasonableness of the agency's choice. *Schurz Communications, Inc. v. FCC*, 982 F.2d 1043, 1049 (7th Cir.1992).

That undemanding standard is not satisfied. The fact that nameplate capacity is specified in the two preceding subsections of the statute is not a reason why the capacity measure for (c)(3) "should also be nameplate." It is a reason against. All three subsections were enacted at the same time. Two use "nameplate capacity" and (c)(3), the very next section, the one at issue here, uses a *different* term, "generating capacity." This would ordinarily be thought strong evidence that Congress meant something different. Maybe not. But the EPA does not discuss the history or structure of the statute, the different rationales of the different sections, or—the agency's special province—technical or administrative considerations that might favor defining generating capacity as nameplate capacity. It rests its decision entirely on the heretofore unknown principle of statutory interpretation that if section 1 says *AB,* and section 2 says *AB,* and section 3 says *CB,* and $C \neq A,$ nevertheless $CB = AB.$

The agency has failed to furnish a reasoned basis for its actions. We do not say that it cannot do so. This is a technical field. The EPA knows more about it than we do and under *Chevron* has the primary responsibility for interpreting undefined terms. But it has not furnished a reasoned ground for denying these utilities' requests for additional allowances and it therefore must, if it wants to adhere to its denial, try again. It must explain how its denial furthers the goals, or is required by administrative exigencies, of the acid-rain program.

The petitions for review are granted, the disallowance of the petitioners' claims for additional emission allowances is vacated,

and the matter is returned to the agency for further consideration in conformity with this opinion.

VACATED AND REMANDED.