69 F.3d 752
 CINCINNATI BELL TELEPHONE COMPANY (94-3701; 95-3023);
BellSouth Corporation; BellSouth Telecommunications, Inc.;
BellSouth Enterprises, Inc. (94-4113; 95-3315); Radiofone,
Inc. (95-3238), Petitioners,
United States Telephone Association; U.S. West, Inc.; New
York Telephone Company; New England Telephone and
Telegraph Company; Radiofone, Inc., Intervenors,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
Pacific Bell; Nevada Bell; MCI Telecommunications
Corporation; AT&T Corporation; US West, Inc., Intervenors.
 Nos. 94-3701, 94-4113, 95-3023, 95-3238 and 95-3315.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 10, 1995.
Decided Nov. 9, 1995.
 
 Douglas E. Hart (argued & briefed), Thomas E. Taylor, Frost & Jacobs, Cincinnati, OH, for Cincinnati Bell Telephone Company in Nos. 94-3701, 95-3023.
 Mary McDermott, United States Telephone Association, Washington, DC, for United States Telephone Association.
 Robert B. McKenna, Washington, DC, for U.S. West, Inc. in Nos. 94-3701, 95-3023 and 95-3315.
 William B. Barfield (briefed), Atlanta, GA, for BellSouth Corporation, BellSouth Telecommunications, Inc., BellSouth Enterprises, Inc. in No. 94-3701.
 Joseph DiBella, White Plains, NY, for New York Telephone Company, New England Telephone and Telegraph Company, in Nos. 94-3701, 94-4113.
 John E. Ingle (briefed), James M. Carr, Joel Marcus (argued & briefed), Office of the General Counsel, Federal Communications Commission, Washington, DC, for Federal Communications Commission in No. 94-3701.
 Robert J. Wiggers, Cathrine G. O'Sullivan, U.S. Department of Justice, Antitrust Division, Washington, DC, for United States in Nos. 94-3701, 95-3023.
 Frank W. Krogh, Donald J. Elardo, MCI Telecommunications Corp., Washington, DC, for MCI Telecommunications Corp. in Nos. 94-3701, 95-3023.
 Michael K. Kellogg (briefed), Austin C. Schlick (argued), Kellogg, Huber, Hansen, Todd & Evans, Washington, DC, for Pacific Telesis Mobile Services, Pacific Bell Mobile Services in No. 94-3701.
 William B. Barfield (briefed), Atlanta, GA, Craig E. Gilmore, Robert G. Kirk, Michael D. Sullivan, L. Andrew Tollin (argued & briefed), Wilkinson, Barker, Knauer & Quinn, Washington, DC, Jim O. Llewellyn, John F. Beasley, BellSouth Corporation, Atlanta, GA, for BellSouth Corporation, BellSouth Telecommunications, Inc., BellSouth Enterprises, Inc. in Nos. 94-4113, 95-3315.
 Ashton R. Hardy (argued & briefed), J. Michael Lamers (briefed), Hardy & Carey, Metairie, LA, for Radiofone, Inc. in Nos. 94-4113, 95-3238.
 
 
 1
 John E. Ingle (briefed), James M. Carr, William E. Kennard (briefed), Office of the General Counsel, Federal Communications Commission, Washington, DC, for Federal Communications Commission in No. 94-4113.
 
 
 2
 Robert J. Wiggers, Cathrine G. O'Sullivan, U.S. Department of Justice, Antitrust Division, James M. Carr, William E. Kennard, Office of the General Counsel, Federal Communications Commission, Washington, DC, for U.S. in No. 94-4113.
 
 
 3
 Michael K. Kellogg (briefed), Kellogg, Huber, Hansen, Todd & Evans, Washington, DC, for Pacific Telesis Mobile Services, Pacific Bell Mobile Services in Nos. 94-4113, 95-3238 and 95-3315.
 
 
 4
 David Cosson, L. Marie Guillory, National Telephone Cooperative Association, Washington, DC, for National Telephone Cooperative Association.
 
 
 5
 Robert J. Wiggers, U.S. Department of Justice, Antitrust Division, John E. Ingle (briefed), James M. Carr, William E. Kennard (briefed), Joel Marcus (argued & briefed), Office of the General Counsel, Federal Communications Commission, Washington, DC, for Federal Communications Commission in No. 95-3023.
 
 
 6
 David W. Carpenter, Sidley & Austin, Chicago, IL, for AT&T Corp.
 
 
 7
 Michael K. Kellogg (briefed), Kellogg, Huber, Hansen, Todd & Evans, Washington, DC, for Pacific Telesis Mobile Services, Pacific Bell Mobile Services in No. 95-3023.
 
 
 8
 Joel Marcus (argued & briefed), Office of General Counsel, Federal Communications Commission, Washington, DC, for Federal Communications Commission in No. 95-3238.
 
 
 9
 Robert B. Nicholson, Robert J. Wiggers, Cathrine G. O'Sullivan, U.S. Department of Justice, Antitrust Division, Washington, DC, for U.S. in No. 95-3238.
 
 
 10
 William E. Kennard (briefed), Joel Marcus (argued & briefed), Office of General Counsel, Federal Communications Commission, Washington, DC, for Federal Communications Commission in No. 95-3315.
 
 
 11
 Robert J. Wiggers, Cathrine G. O'Sullivan, U.S. Department of Justice, Antitrust Division, William E. Kennard, Office of General Counsel, Federal Communications Commission, Washington, DC, for U.S. in No. 95-3315.
 
 
 12
 Before: MARTIN and BATCHELDER, Circuit Judges; EDMUNDS, District Judge.*
 
 
 13
 BOYCE F. MARTIN, Jr., Circuit Judge.
 
 
 14
 In these consolidated petitions to review decisions of the Federal Communications Commission, Cincinnati Bell, Radiofone, and BellSouth take issue with various aspects of the agency's rulemaking regarding ownership limitations in the wireless communications industry. Cincinnati Bell and Radiofone challenge certain cross-ownership and attribution rules which restrict the ability of current cellular communications providers to bid on new wireless communications licenses. BellSouth appeals the FCC's determination, made during the course of the same rulemaking, that the record did not contain sufficient information for the FCC to decide whether to rescind a 1981 rule that requires each of the Bell Operating Companies to hold its cellular licenses in a subsidiary that is managed separately from the parent Bell Company.
 
 
 15
 The FCC has designated a range of radio frequencies to be used in providing new broadband Personal Communications Services, a wireless communications service that is expected to compete with existing wireless telephone services. Three other mobile, wireless communications services exist. "Cellular" provides services commonly associated with mobile telephone operations, such as a car phone. "Specialized Mobile Radio" is a wireless service traditionally used to provide dispatch service, such as that used for a fleet of taxis. In another recent proceeding, the FCC relaxed its regulations on Specialized Mobile Radio to allow licensees to consolidate Specialized Mobile Radio spectrum[1] and compete with Cellular and Personal Communications Service in the provision of services to car phone and portable mobile telephone customers. Finally, "Mobile Satellite Service" is a fairly new wireless service that allows subscribers to use their mobile telephones and other communications devices via satellite. Mobile Satellite Service differs from Cellular in that, because its satellite relays are not blocked by terrain in the way that Cellular's land based relays are, Mobile Satellite Service users can communicate via mobile telephone from virtually anywhere in the world.
 
 
 16
 Licenses for the wireless communications industry within the United States are distributed by geographic region. Currently, two Cellular providers hold licenses in each geographic region and compete for wireless communications customers within that region. The new Personal Communications Service is expected to compete almost immediately with Cellular in providing wireless communications in each geographic region. Personal Communications Service licensees will hold their licenses for a period of ten years, and have an expectation of renewal on the licenses. To ensure competition in the wireless industry, the FCC issued rules which placed Personal Communications Service ownership restrictions on current Cellular providers, several of which are at issue here.
 
 
 17
 The Communications Act of 1934, as amended, 47 U.S.C. Sec. 151-613 (1988), confers authority upon the FCC to use a competitive bidding system, or auction, for awarding wireless communications licenses. Section 309(j)(3) of the Act, which provides for the design of the auction, states that the FCC shall "include safeguards to protect the public interest" and that the FCC should pursue several objectives when designing the auction, including:
 
 
 18
 (A) the development and rapid deployment of new technologies, products, and services for the benefit of the public, including those residing in rural areas, without administrative or judicial delays;
 
 
 19
 (B) promoting economic opportunity and competition and ensuring that new and innovative technologies are readily accessible to the American people by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women;....
 
 
 20
 47 U.S.C. 309(j)(3)(A)-(B) (Supp. V 1994).
 
 
 21
 In addition, Section 309(j)(4) of the Act provides:In prescribing regulations pursuant to paragraph (3), the Commission shall--
 
 
 22
 . . . . .
 
 
 23
 (C) consistent with the public interest, convenience, and necessity, the purposes of this chapter, and the characteristics of the proposed service, prescribe area designations and bandwidth assignments that promote (i) an equitable distribution of licenses and services among geographic areas, (ii) economic opportunity for a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women, and (iii) investment in and rapid deployment of new technologies and services;....
 
 
 24
 Id. at Sec. 309(j)(4)(C).
 
 
 25
 The rulemaking process governing the issuance of Personal Communications Service licenses began in 1990, when the FCC sent out a Notice of Inquiry, 5 F.C.C.R 3995 (1990), expressing its concern over undue concentration of control over the wireless communications spectrum. The notice posed the question of "whether there is a need for any restrictions on eligibility for a [Personal Communications Service] license in a particular [geographic] market." Id. at 3999. On August 14, 1992, the FCC released a Notice of Proposed Rule Making and Tentative Decision (Amendment of the Commission's Rules to Establish New Personal Communications Services), 7 F.C.C.R. 5676 (1992), asking in part whether Cellular providers should be allowed to obtain Personal Communications Service licenses in their existing service areas. Id. at 5703. On October 22, 1993, the FCC released its Second Report and Order, 8 F.C.C.R. 7700 (1993), which contained rules for licensing Personal Communications Service. The Second Report and Order divided the one hundred and twenty Megahertz of spectrum allocated for Personal Communications Service into several blocks, which were later re-allocated as three thirty MHz blocks and three ten MHz blocks. Id. at 7715; see Memorandum Opinion & Order (In the Matter of the Commission's Rules to Establish New Personal Communications Services), 9 F.C.C.R. 4957 (1994).
 
 
 26
 In its Second Report and Order, the FCC noted that it had statutory authority to allocate licenses by auction under 47 U.S.C. Sec. 309(j), which commands the FCC to establish criteria for license eligibility that would "promot[e] economic opportunity and competition and ensur[e] that new and innovative technologies are readily accessible to the American people by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants...." Id. at 7707; 47 U.S.C. Sec. 309(j)(3)(B) (Supp. V 1994). The FCC concluded that Section 309(j)(3)(B) reflected an explicit congressional approval of promoting competition in the industry and of a wide distribution of Personal Communications Service licenses. Second Report and Order, 8 F.C.C.R. at 7707. The FCC also concluded that its goal was to promote broad participation by wireless communications businesses in Personal Communications Service, ensure that existing Cellular operators did not exert undue market power, but at the same time take advantage of the Cellular operators' expertise and existing infrastructures for the expeditious development of the new Personal Communications Service.
 
 
 27
 Ultimately, the FCC adopted rules that allowed existing Cellular providers to bid on and develop Personal Communications Service licenses outside of their current geographic cellular service areas. However, where the Cellular providers' existing territory overlapped the population of a new Personal Communications Service geographic area by ten percent or more, the Cellular provider could acquire no more than one of the ten MHz spectrum blocks in that geographic area. 47 C.F.R. Secs. 24.204(a)-(f) (1994). The FCC also limited all Personal Communications Service licensees to a total of forty MHz of spectrum in any one license area. Id. at Sec. 24.229(c). In addition, the FCC removed restrictions on its Cellular rules to allow Cellular license holders to compete with, and provide services similar to, the new Personal Communications Service licensees.[2] Second Report and Order, 8 F.C.C.R. at 7747.
 
 
 28
 The FCC also adopted "attribution" rules for determining whether an entity would be designated as a Cellular provider, thereby restricting that entity's ability to own Personal Communications Service spectrum. 47 C.F.R. Sec. 24.204(d)(1994). For largely unexplained reasons, the FCC ultimately embraced a twenty percent ownership test. A corporation holding less than a twenty percent ownership share of an existing Cellular provider would be free to bid on and own up to forty MHz of Personal Communications Service spectrum. A corporation holding a twenty percent or more ownership interest in an existing Cellular provider would be subject to the limiting rules and could acquire only one ten MHz block of Personal Communications Service spectrum. Id. at Sec. 24.204(d)(2)(ii).
 
 
 29
 Cincinnati Bell takes issue with the FCC's twenty percent "attribution" rule, which restricts a company holding a twenty percent or more ownership interest in an existing Cellular provider to one ten MHz block of Personal Communications Service spectrum. Cincinnati Bell argues that this bright line rule is arbitrary and capricious because there is no adequate basis in the record to support the rule. Further, Cincinnati Bell argues that the distinction between companies holding less than a twenty percent interest and those holding a non-voting minority interest holder of more than twenty percent is unfairly discriminatory. It argues that the FCC's failure to consider reasonable alternatives was an abuse of discretion by the agency and thus in violation of the FCC's statutory grant of authority.
 
 
 30
 Cincinnati Bell argues further that the record before the FCC is inadequate to support a rational conclusion that the twenty percent Cellular attribution rule reasonably furthers the objectives of the statute.
 
 
 31
 Our standard of review is governed by the Administrative Procedure Act, 5 U.S.C. Sec. 706 (1988), which provides that a "reviewing court shall ...
 
 
 32
 (2) hold unlawful and set aside agency action, findings and conclusions found to be--
 
 
 33
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;....
 
 
 34
 Under the arbitrary and capricious standard of Section 706(2)(A), this Court's scope of review is narrow. Ohio Bell Tel. Co. v. Federal Communications Comm'n, 949 F.2d 864, 872 (6th Cir.1991) (citation omitted). Our first basic step is to consider whether the agency has considered the relevant factors involved and whether there has been a clear error of judgment. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823-24, 28 L.Ed.2d 136 (1971). The agency must articulate a "rational connection between the facts found and the choice made." City of Brookings Mun. Tel. Co. v. Federal Communications Comm'n, 822 F.2d 1153, 1165 (D.C.Cir.1987) (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). We will not supply the basis for the agency's action, but instead rely on the reasons advanced by the agency in support of the action. Ohio Bell Tel., 949 F.2d at 872 (relying on Securities Exchange Comm'n v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)).
 
 
 35
 During the course of the rulemaking process, the FCC stated that the Cellular attribution rule was an attempt to balance several objectives. First, the FCC wanted to prevent incumbent cellular licensees from exerting undue market power in the Personal Communications Service market. Second, the FCC did not want to foreclose completely entities with passive Cellular interests from obtaining Personal Communications Service licenses, primarily because existing Cellular companies could provide expertise, economies of scope, and existing infrastructures to the Personal Communications Service market. In addition, the FCC recognized that it had encouraged settlements between companies during the licensing of the Cellular market, which resulted in many entities holding passive, non-controlling interests in Cellular licensees. Finally, while still taking over three years to issue the final order, the FCC believed that, because Congress had expressly ordered the licenses to be distributed "without administrative or judicial delays," 47 U.S.C. Sec. 309(j)(3)(A), an easily applied, bright-line rule was appropriate, rather than a "control" test requiring a case-by-case determination.
 
 
 36
 Cincinnati Bell argues that, in light of these stated objectives, the FCC should have adopted a Cellular attribution rule that differentiated between entities with controlling cellular interests and those with passive, noncontrolling interests. Noting that the twenty percent attribution rule makes no distinction between different types of ownership, such as voting and non-voting stock, or general and limited partnership interests, Cincinnati Bell claims that no reasoned business or economic analysis exists in the record to support the FCC's adoption of the rule. It points out that the FCC expressly recognized that its rule would restrict the opportunities of certain investors in Cellular licensees to participate in the Personal Communications Service market, even though those investors had no meaningful involvement in the Cellular licensee and could not control or influence its actions.
 
 
 37
 Cincinnati Bell relies on Aeronautical Radio, Inc. v. Federal Communications Comm'n, 928 F.2d 428 (D.C.Cir.1991), in support of its argument. In Aeronautical Radio, the FCC awarded a Mobile Satellite Service license to a consortium of qualified entities. The FCC adopted a rule requiring each applicant to make a five million dollar cash contribution to the consortium fund as evidence of the applicant's financial health. Confronted with a challenge to the agency's decision to require a cash deposit instead of performance bonds or letters of credit, the court stated that "[a]ny financial eligibility requirement imposed upon license applicants must bear some reasonable relationship to true financial fitness." Id. at 447. The court concluded that "the cash rule appears to have been nothing more than an arbitrary device by which the Commission was able to winnow the applicant field, thus increasing the probability that a joint agreement could be reached among the survivors." Id. Cincinnati Bell argues that, as in Aeronautical Radio, any Cellular attribution standard designed to prevent anti-competitive behavior by an entity holding a minority interest in a Cellular licensee must bear some reasonable relationship to that entity's ability to control the Cellular licensee.
 
 
 38
 We agree. The twenty percent Cellular attribution standard bears no relationship to the ability of an entity with a minority interest in a Cellular licensee to obtain a Personal Communications Service license and then engage in anti-competitive behavior. For example, under the FCC's current attribution rule, an entity with a non-voting, twenty-one percent interest in a Cellular licensee in which the other seventy-nine percent is owned by one party is foreclosed from obtaining a Personal Communications Service license, even though the entity holding the minority interest has no way of controlling the behavior of the Cellular licensee under the Cellular licensee's ownership structure. On the other hand, an entity holding a voting, nineteen percent minority share in a Cellular licensee with a multiple, diversified ownership structure--an entity that quite clearly can exert some influence over the Cellular licensee's behavior--may freely bid on and obtain a Personal Communications Service license.
 
 
 39
 The FCC points out that it relied in part on the Financial Accounting Standards Board's approach to corporate ownership, which deems twenty percent ownership to convey presumptive control over a company. Third Memorandum Opinion and Order (Amendment of the Commission's Rules to Establish New Personal Communications Services), 9 F.C.C.R. 6908, 6913 (1994). According to the FCC, this establishes that its decision to use twenty percent ownership as the demarcating line is reasonable and not arbitrary or capricious. We find this argument unpersuasive. The Financial Accounting Standards Board's ownership standard is simply a presumptive rule; any party may rebut the standard by showing that another entity holds a greater interest in the company at issue. As a presumptive rule that any party may rebut, the Board's standard is still tied to the issue of control. In contrast, the FCC's twenty percent standard is an absolute ban on participation in Personal Communications Service by any entity with a twenty percent or more interest in a Cellular licensee. Recast as an absolute ban rather than a simple presumption, the rule is unrelated to whether a party actually has control over a Cellular licensee.
 
 
 40
 The FCC also argues that, even in situations where, concededly, an entity with a minority interest in a Cellular licensee cannot control the behavior of that licensee, the entity's substantial stake in the Cellular licensee would reduce the entity's incentive to compete--as a Personal Communications Service licensee--with the Cellular company in which it holds a minority interest. The FCC urges us to defer to this "common sense" conclusion as a predictive judgment based on the FCC's expertise. See, e.g., Black Citizens for a Fair Media v. Federal Communications Comm'n, 719 F.2d 407, 417 (D.C.Cir.1983), cert. denied, 467 U.S. 1255, 104 S.Ct. 3545, 82 L.Ed.2d 848 (1984).
 
 
 41
 However, this "predictive judgment" as to the possible future behavior of future marketplace entrants is highly suspect, makes little common sense, and the FCC provides to this Court nothing, no statistical data or even a general economic theory, to support its argument. The FCC claims that entities with reasonably large, yet non-controlling stakes in Cellular providers, will have a reduced incentive to compete in the wireless communications marketplace, primarily because the entity would not want to take customers away from the Cellular provider in which it holds an interest. We find this argument unpersuasive, unsupported as it is by any record evidence. The FCC might have attempted to justify its rule through the use of expert economic data, or by analogizing to related industries in which the claimed anticompetitive behavior has taken place. It chose not to do this. Instead, it claims that its conclusion--that an entity with a twenty or more percent interest in a Cellular provider would not compete with that Cellular provider as a Personal Communications Service licensee--is simply "common sense." It appears to us, however, that the only rational conclusion--given the high cost of obtaining a Personal Communications license, the strict build-out requirements for licensees, and the existence of at least two other large Personal Communications Service providers in each market--is that a business competing at a less than efficient level will soon be driven out of the marketplace. We may be wrong. This Court certainly is not prescient, and we do not demand this from the FCC. What we do demand, however, is that the FCC provide at least some support for its predictive conclusions. See Century Communications Corp. v. Federal Communications Comm'n, 835 F.2d 292, 300-02 (D.C.Cir.1987) (rejecting FCC's judgment where supported by "scant" evidence), cert. denied, 486 U.S. 1032, 108 S.Ct. 2014, 2015, 100 L.Ed.2d 602 (1988). Here, the FCC simply has not provided anything resembling support for its forecasts of possible future economic behavior.
 
 
 42
 The FCC also argues that an easily applied, bright-line rule is needed to avoid unnecessary delays in determining Personal Communications Service eligibility issues and speed the administrative process. It claims that a "control" test, which would require a case-by-case determination as to eligible Personal Communications Service licensees, will unduly delay the competitive bidding proceedings. In response, Cincinnati Bell argues that the Commission has adopted less restrictive, and yet easily administered, rules in other situations. It points to the FCC's attribution rule for determining when businesses owned by minorities or women will be eligible to bid on spectrum in the upcoming C Block auctions. Under the FCC's rules, minority or women-owned businesses are eligible to bid on the C Blocks as long the businesses maintain ownership of at least 50.1 percent of the equity and 50.1 percent of the voting interests. Non-minority investors are allowed to own up to 49.9 percent of the business. See 47 C.F.R. Sec. 24.709. Cincinnati Bell also points to the attribution standards associated with ownership of broadcast stations by other broadcast stations or newspapers. Broadcasting ownership rules bar "cognizable" interests, and where a single entity holds more than fifty percent of the voting stock, no minority interest is cognizable for attribution purposes. See 47 C.F.R. Sec. 73.3555 (1994). Cincinnati Bell argues that, to the extent that the twenty percent bright-line rule is premised on administrative convenience, the FCC should have supplied a reasoned basis for its decision not to adopt these less restrictive alternatives.
 
 
 43
 We agree. The FCC is required to give an explanation when it declines to adopt less restrictive measures in promulgating its rules. City of Brookings Municipal Tel. Co., 822 F.2d at 1169. The failure to do so permits reversal of the FCC's attribution rule. Id. Here, the FCC has not explained why less restrictive, yet easily administered rules such as the "cognizable" interest test fail in light of its stated objectives. The FCC's conclusory statements, that its rule is based on "common sense" economic conclusions and that the twenty percent rule is necessary as a bright-line test, wholly fail to provide a reasoned explanation as to why the less restrictive alternatives described above are insufficient. See Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 48, 103 S.Ct. 2856, 2869, 77 L.Ed.2d 443 (1983) (holding that an "alternative way of achieving the [stated] objectives ... should have been addressed and adequate reasons given for its abandonment").
 
 
 44
 In light of the preceding discussion, we hold that the FCC's twenty percent attribution rule is arbitrary. Accordingly, the Cincinnati Bell petition is granted and remanded for further proceedings on this issue.
 
 
 45
 Radiofone broadly challenges the FCC's Cellular eligibility rules, codified at 47 C.F.R. Sec. 24.204. Radiofone claims that the FCC exceeded its statutory mandate by adopting cross-ownership restrictions between Cellular and Personal Communications Service spectrum.[3] In addition, Radiofone argues that, even if the FCC has not violated its organic statute, its cross-ownership rules are arbitrary and capricious with no support in the record and unfairly discriminate against Cellular providers.
 
 
 46
 We review challenges to an agency's construction of its organic statute under Chevron, U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). See BP Exploration & Oil, Inc. v. Environmental Protection Agency, 66 F.3d 784, 791 (6th Cir.1995). The two-step inquiry under Chevron begins by determining whether Congress has directly spoken to the matter at issue. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781 (footnote omitted). If Congress has not directly addressed the issue, a reviewing court must determine whether the agency's position is "based on a permissible construction of the statute." Id. (footnote omitted).
 
 
 47
 Here, the language of the Act clearly evinces Congress's intention that the FCC conduct auctions for distributing the Personal Communications Service licenses. Section 309(j)(3) outlines the procedures for conducting "competitive bidding" and directs the FCC to "[promote] economic opportunity and competition and ... [avoid] excessive concentration of licenses...." Nonetheless, Radiofone argues, relying on Section 309(j)(3)(B), that Congress's mandate to the FCC was only to ensure that "small businesses, rural telephone companies, and businesses owned by members of minority groups and women" were able to compete in the Personal Communications Service auctions. According to Radiofone, the FCC exceeded this mandate by interpreting Section 309 as giving it the authority to exclude certain entities from the bidding process.
 
 
 48
 We believe that the FCC has not exceeded its statutory authority here. Section 309(j)(3) confers authority upon the FCC to place certain restrictions on the bidding process in order to ensure that a wide variety of applicants are able to meaningfully participate in the Personal Communications Service market. A plain reading of Section 309(j)(3)(B), which directs the FCC to promote "economic opportunity and competition ... by avoiding excessive concentration of licenses and disseminating licenses among a wide variety of applicants," indicates that Congress clearly conferred authority on the FCC to place restrictions and limitations on the bidding process.
 
 
 49
 Radiofone argues, however, that the statute only permits the FCC to adopt rules that ensure the participation of certain groups, including small businesses and businesses owned by minorities and women. Under Radiofone's interpretation of the statute, the cross-ownership restrictions, to the extent that they seek to promote wide participation in Personal Communications Service and competition generally (over and above promoting participation and competition from the explicitly referenced groups), exceed the scope of Congress's mandate to the FCC. We disagree. In our view, the phrase "including small businesses, rural telephone companies, and businesses owned by members of minority groups and women," was not meant by Congress as an exhaustive list of the permissible groups for which the FCC might adopt certain rules to enhance their participation in the bidding process. Rather, the list is merely illustrative of Congress's particular concern that these groups participate in the auctions. Congress was also concerned, in Section 309(j)(3)(B), with the possibility of "excessive concentration of licenses" and directed the FCC to develop a competitive bidding process to avoid this result. In light of this, we believe the FCC has not impermissibly interpreted its organic statute as giving it the authority to establish at least some eligibility criteria to promote competition and avoid undue concentration of licenses.
 
 
 50
 Radiofone next argues that, even if the FCC has not exceeded its statutory authority by restricting Cellular providers from participating in the Personal Communications Service auctions, its cross-ownership rules are arbitrary and capricious because no support for the rules exists in the record. Our standard of review regarding a substantive challenge to the FCC's rules was discussed earlier in this opinion. We note in addition that an agency ordinarily must consider less restrictive alternatives and should explain its reasons for failing to adopt such alternatives. Motor Vehicle Mfrs. Ass'n., 463 U.S. at 48, 103 S.Ct. at 2869.
 
 
 51
 Radiofone stresses several points in support of its claim that the FCC's cross-ownership restrictions are arbitrary. First, Radiofone alleges that the FCC has waffled back and forth on the likelihood of Cellular providers to engage in anticompetitive conduct and, although it had ample opportunity to do so, never provided record evidence to support its concerns. Initially, the FCC stated that it was concerned that permitting Cellular providers to acquire Personal Communications Service licenses within the Cellular providers current service area "could facilitate anticompetitive behavior." Notice of Proposed Rule Making and Tentative Decision, 7 F.C.C.R. 5676, 5702 (1992). In its Second Report and Order, 8 F.C.C.R. at 7746, the FCC then claimed that Cellular providers could "exert undue market power." In its Memorandum Opinion and Order, 9 F.C.C.R. at 4999, the FCC stated that its goal in adopting the Cellular eligibility restrictions "should not be to prevent anticompetitive behavior which may or may not materialize, but rather, to promote competition." Finally, in its Third Memorandum Opinion and Order, 9 F.C.C.R. at 6913, the FCC apparently reversed itself again, reiterating that the Cellular eligibility restrictions were designed to prevent anticompetitive behavior. Radiofone claims that, although the FCC had the opportunity to support its concerns regarding possible anticompetitive conduct and undue market power in any of the above proceedings, it did not. Accordingly, Radiofone requests this Court to set aside the Cellular eligibility restrictions at issue.
 
 
 52
 We agree that the Cellular eligibility rules are the product of arbitrary decisionmaking. During these proceedings, the FCC provided little or no support for its assertions that Cellular providers, released from all regulatory shackles and given free reign to roam the wireless communications landscape, might engage in anticompetitive behavior or exert undue market power through, for example, predatory pricing schemes. Radiofone provides a simple answer to why the FCC did not produce the requisite documentary evidence to back up its stated concerns. According to Radiofone, there is none. It claims that given the fact that a business must spend, in some cases, hundreds of millions of dollars to obtain a Personal Communications Service license, and then must commit itself to a mandatory build-out schedule that is likely to cost several more millions, the assumption the Cellular providers will then engage in anticompetitive behavior "defies logic." Further, Radiofone argues that, not only did the FCC fail to support its conclusions, but that it failed to explain why the less restrictive alternatives that it had already adopted (namely the competitive bidding process and the strict build-out requirement) would not achieve the same goals. See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 48, 103 S.Ct. at 2869; Telocator Network of America v. Federal Communications Comm'n, 691 F.2d 525, 537 (D.C.Cir.1982) (requiring FCC to consider reasonably obvious alternatives).
 
 
 53
 Under the current Cellular eligibility rules, a business which has as little as a twenty percent interest in an existing Cellular provider cannot purchase a Personal Communications Service license if there is a ten percent overlap in the Cellular and Personal Communications Service population areas. Radiofone argues that these ownership and overlap benchmarks are not rationally related to the FCC's asserted goal of preventing undue market power. It claims that the FCC's conclusion that businesses with a mere twenty percent interest in a Cellular provider that serves a mere ten percent of the Personal Communications Service area could exert undue market power is implausible.
 
 
 54
 In support of its Cellular eligibility restrictions, the FCC, rather than showing that it actually had some factual support for its conclusions, uses the "deference" standard of review as if it were an ink blotter waiting for this Court's rubber stamp to validate agency action. Notwithstanding the FCC's mantra-like incantations of "deference," we find the record to be insufficient to support the Cellular eligibility rules at issue. Although the FCC is correct in pointing out that its predictive judgments are entitled to a fair degree of deference, Wold Communications, Inc. v. Federal Communications Comm'n, 735 F.2d 1465, 1468 (D.C.Cir.1984) (citation and quotation omitted), it does not have "unfettered discretion" in its regulatory powers.[4] Id. at 1475. It must supply a reasoned basis explaining why it chose to adopt a certain rule or rules. Schurz Communications, Inc. v. Federal Communications Comm'n, 982 F.2d 1043, 1049 (7th Cir.1992). Post-hoc rationalization is not a suitable substitute for reasoned rulemaking, and support for the agency's action must exist in the rulemaking record. Coastal Tank Lines, Inc. v. Interstate Commerce Comm'n, 690 F.2d 537, 543 (6th Cir.1982) (citing Burlington Truck Lines, Inc., 371 U.S. at 168, 83 S.Ct. at 245-46). As in Schurz Communications, the question in this case is not whether the FCC has the authority to place certain restrictions on the bidding process, but whether the FCC "has said enough to justify, in the face of the objections lodged with it, the particular restrictions that it imposed...." Schurz Communications, Inc., 982 F.2d at 1049. Unfortunately, the FCC has not, in its brief nor at oral argument before this Court, pointed to anything in the record which would justify its Cellular eligibility restrictions.
 
 
 55
 The FCC argues that it relied on a General Accounting Office report which found that the current wireless communications markets were not fully competitive and recommended the allocation of spectrums to new firms rather than existing Cellular providers. See GAO, Concerns About Competition in the Cellular Telephone Industry, 2-4 (1992). However, the GAO report is no better than the FCC's asserted justifications in providing any factual support for its conclusions. The report contains broadly stated "findings" that the Cellular market is less than optimally competitive, and generalized conclusions about the need to restrict Cellular interests from obtaining Personal Communications Service licenses. Something more is needed. The Cellular eligibility restrictions have a profound impact on businesses in an industry enmeshed in this country's telecommunications culture. The amounts of money at stake reach into the billions of dollars. The continued existence of some wireless communications businesses rests on their ability to bid on Personal Communications Service licenses. Indeed, at oral argument counsel for the FCC admitted that, given the uncertain nature of the future in the wireless communications market, Cellular providers foreclosed from obtaining Personal Communications Service licenses may ultimately be left holding the remnants of an obsolete technology. Precisely because the Cellular eligibility restrictions have such a profound effect on the ability of businesses to compete in the twenty-first century technology of wireless communications, it was incumbent upon the FCC to provide more than its own broadly stated fears to justify its rules.
 
 
 56
 The FCC argues that the Cellular eligibility rules were not solely designed to combat possible antitrust law violations, but also to avoid "excessive concentration of licenses" and to diversify ownership interests in the wireless communications field. However, if the FCC were truly concerned about diversifying ownership, the current rules are a curious way of going about it. Cellular providers are able to bid on every Personal Communications Service license in the country, except those population areas in which the Cellular licensee currently provided service. Of course, this simply allows the communications industry giants, those with the current infrastructure to bid nationwide on Personal Communications Service licenses, to purchase almost all of the new licenses. In the A and B Block auctions, the ninety-nine licenses issued by the FCC were awarded to just nineteen companies. AT & T, Nynex, Bell Atlantic, and Sprint were among the largest bidders, hardly a broad diversification of ownership. In fact, smaller companies such as Radiofone--because the FCC's cross-ownership restrictions prevent them from doing so--were unable to bid in the one geographic area in which they might be able to provide service, namely the area in which they already provide Cellular service.
 
 
 57
 Further, while avoiding excessive concentration of licenses certainly is a permissible goal under the Communications Act, simply precluding a class of potential licensees from obtaining licenses (without a supported economic justification for doing so) solves the problem arbitrarily. Accord Schurz Communications, 982 F.2d at 1050. The FCC must supply a reasoned basis for its decision. See Petroleum Communications, Inc. v. Federal Communications Comm'n, 22 F.3d 1164, 1172 (D.C.Cir.1994) (noting that a reviewing court must set aside agency action where agency fails to provide a reasoned explanation for its conclusions). The need to avoid "excessive concentration of licenses" does not provide the requisite "reasoned basis." Without any economic rationale, the Cellular eligibility rules are nothing more than an arbitrary regulation of who may bid on which Personal Communications Service licenses.
 
 
 58
 The foregoing discussion leads us to conclude that the FCC has acted arbitrarily in adopting its Cellular eligibility restrictions. The record contains little or no factual support for the eligibility rules and the FCC has added nothing that might justify its conclusions. Before the FCC may foreclose such businesses as Radiofone from obtaining a thirty MHz Personal Communications Service license within their geographic region, it must provide something in the way of documentary support for its asserted fears that Cellular providers will detrimentally affect the market if allowed to become Personal Communications Service licensees.
 
 
 59
 Finally, we note that, while attempting to buttress the Cellular eligibility restrictions, the FCC may simply find more support for its conclusions. However, as Judge Posner has stated so well, "Not all remands result in the reinstatement of the original decision with merely a more polished rationalization." Schurz Communications, 982 F.2d at 1050. Perhaps the FCC's reexamination of the Cellular eligibility rules will result in a modification of those rules.
 
 
 60
 Radiofone also claims that the restrictions on Cellular ownership unfairly discriminate against Cellular providers, because the cross-ownership restrictions do not apply to Specialized Mobile Radio or Mobile Satellite Service providers. Radiofone claims that the difference in treatment between Cellular, Specialized Mobile Radio, and Mobile Satellite Service providers violates the substantive due process provisions of the Fifth Amendment. Different eligibility standards for Personal Communications Service licenses must have a rational basis and classifications cannot be arbitrary. McLaughlin v. Florida, 379 U.S. 184, 190, 85 S.Ct. 283, 287, 13 L.Ed.2d 222 (1964). Specialized Mobile Radio and Mobile Satellite Service providers are not subject to eligibility restrictions on obtaining Personal Communications Service licenses. According to Radiofone, the difference in treatment between Specialized Mobile Radio and Mobile Satellite Service on the one hand, and Cellular on the other, lacks a rational basis.
 
 
 61
 The FCC points out that a later Commission order imposed an aggregate cap of forty-five MHz on Specialized Mobile Radio, Cellular, and Personal Communications Service spectrum in all service areas.[5] See Third Report and Order (Regulatory Treatment of Mobile Service), 9 F.C.C.R. 7988, 8109 (1994). According to the FCC, this cap acts as an independent limitation on the amount of spectrum that any entity is able to aggregate in a single wireless communications service area. The FCC argues that the difference in its treatment of Cellular and Specialized Mobile Radio providers, given that Specialized Mobile Radio providers are prohibited from aggregating more than forty-five MHz of total spectrum, is not as great as Radiofone claims.[6]
 
 
 62
 We believe that a rational basis exists to explain the different treatment of Specialized Mobile Radio and Cellular providers. The current difference that exists between the technologies and services provided by Specialized Mobile Radio and Cellular justify the disparate rules at issue. While it is true that the FCC expects that Specialized Mobile Radio, Cellular, and Personal Communications Service licensees will compete on price, quality, and services in the future, Specialized Mobile Radio and Cellular currently do not. The different characteristics of the two markets justifies the FCC's decision to adopt different rules for each of the two kinds of wireless services. See Radio Ass'n on Defending Airwave Rights, Inc. v. United States Dept. of Transportation, 47 F.3d 794, 809 (6th Cir.1995) (applying the rational basis test and holding as rational the disparate treatment of commercial vehicles and other types of automobiles), cert. denied, --- U.S. ----, 116 S.Ct. 59, --- L.Ed.2d ---- (1995). Accordingly, we reject Radiofone's argument that the FCC had no rational basis for classifying Cellular providers as distinct from Specialized Mobile Radio and Mobile Satellite Service licensees.
 
 
 63
 BellSouth appeals the FCC's decision that the Personal Communications Service rulemaking process did not provide a sufficient record for determining whether to rescind a restriction on Bell Operating Companies which required them to offer cellular service through structurally separate subsidiaries. This "structural separation" requirement began in 1981 and currently applies only to Bell Companies. See Cellular Communications Systems, Report and Order, 86 F.C.C.2d 469 (1981); 47 C.F.R. Sec. 22.901 (1994) (reclassified as Sec. 22.903 in Public Mobile Services, Report and Order, 9 F.C.C.R. 6513, 6571, 6660-61 (1994)). The purpose of the structural separation rule was to prevent cross-subsidization of Cellular systems and assure non-discriminatory interconnection for telecommunications service providers. When the FCC transferred the separate subsidiary obligation from AT & T to the Bell Companies, it said it would revisit the rule within two years and would modify or eliminate it if circumstances warranted. See Policy and Rules Concerning the Furnishing of Customer Premises Equipment, Enhanced Services and Cellular Communications Services by the Bell Operating Companies, 95 F.C.C.2d 1117, 1140 (1983). A decade later, the FCC proposed to review the separate subsidiary rule in connection with the Personal Communications Service rule making. Notice of Proposed Rule Making and Tentative Decision, 7 F.C.C.R. at 5706. In the proposal, the FCC proposed to treat Cellular and Personal Communications Service systems alike by allowing all local exchange companies such as the Bells to offer Personal Communications Service without a structural separation requirement and by eliminating the structural separation requirement for providing Cellular service imposed on the Bell Companies.
 
 
 64
 In its Notice of Proposed Rule Making, the FCC noted that the concerns underlying the structural separation requirement--preventing discrimination in interconnection and preventing cross-subsidization of Cellular providers with regulated revenues--probably could be addressed through non-structural safeguards. Notice of Proposed Rule Making, 7 F.C.C.R. at 5705. The FCC explained, as an example of the integration it intended to promote, that local telephone exchange companies might wish to use Personal Communications Service instead of wire connections for providing phone service. It noted that the Bell Companies could not currently use the Cellular spectrum in this manner because the structural separation requirement prohibited them from doing so. By eliminating the structural separation requirement, the FCC hoped that local exchange companies could "capture the necessary economies of scope through use of [cellular] spectrum, rather than newly assigned [Personal Communications Service] spectrum." Id. at 5706. In short, the FCC proposed to allow all local exchange carriers, including the Bell Companies, to provide both Personal Communications Service and Cellular directly, without the structural separation requirement.
 
 
 65
 In its Second Report and Order, 8 F.C.C.R. 7700, the FCC concluded that it would not serve the public interest to impose a structural separation requirement on local exchange carriers' Personal Communications Service operations. Id. at 7751. The FCC found that local exchange carriers could exploit significant economies of scope--ultimately to the consumer's benefit--between their wireline and Personal Communications Service business. The effect of this rule was to allow local exchange carriers, including the Bell Companies, to provide wireless communications service through a Personal Communications Service license directly, without the structurally separate subsidiary requirement. However, the FCC declined to eliminate the structural separation requirement as it applied to the provision of Cellular service by Bell local exchange carriers. The proffered explanation was placed in a footnote in the Second Report and Order.
 
 
 66
 [W]e do not believe the record in this proceeding provides enough information for us to eliminate the [structural separation for Cellular service] requirement at this time.... Under our [Personal Communications Service] rules, however, [the Bells] are free to choose whether or not they will provide [Personal Communications Service] through their separate [C]ellular subsidiaries.
 
 
 67
 Id. at 7751 n.98. The FCC offered no explanation as to why it believed the record insufficient to eliminate the structural separation requirement, even in light of the fact that it found the requirement unnecessary in the Personal Communications Service context.
 
 
 68
 In short, the effect of the rules adopted by the FCC during the course of the Personal Communications Service rulemaking is to allow all local exchange carriers, including the Bells, to offer wireline, local telephone service and wireless communications service arising from a Personal Communications Service license together, a sort of "one-stop shopping" arrangement. However, all Bell local exchange carriers must continue to offer wireless communications service via a Cellular license through a structurally separate subsidiary, which precludes the Bells from providing a full range of services through one company. BellSouth argues that, because the FCC found that Personal Communications Service and Cellular are similar services and also found that the record did not warrant a separate subsidiary requirement for Personal Communications Service licensees, the FCC's failure to drop the requirement as it applied to Bell Companies which offered wireless service through Cellular licenses was arbitrary.
 
 
 69
 As noted previously, our review of agency action is governed by 5 U.S.C. Sec. 706(2)(A), where we review decisions such as this as to whether or not they are arbitrary and capricious. We note that, generally speaking, agencies are not required to deal with every aspect of a problem in one proceeding. National Ass'n of Broadcasters v. Federal Communications Comm'n, 740 F.2d 1190, 1207 (D.C.Cir.1984). Instead, agencies ordinarily may proceed one step at a time when addressing large, complicated issues. Nonetheless, where the factual assumptions which support an agency rule are no longer valid, agencies ordinarily must reexamine their approach. Bechtel v. Federal Communications Comm'n, 957 F.2d 873, 881 (D.C.Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 57, 121 L.Ed.2d 26 (1992).
 
 
 70
 BellSouth argues that the FCC's failure to eliminate the structural separation requirement was not the product of reasoned decisionmaking. It claims that, because the FCC found that Personal Communications Service and Cellular are or will be virtually identical, and that the public interest did not warrant a structural separation requirement for Personal Communications Service, it was arbitrary for the FCC to refuse to drop the structural separation requirement as it applies to the Bell Companies. BellSouth points out that the FCC found, in a contemporaneous proceeding, that the public interest and Congressional policy required it to "establish a symmetrical regulatory structure that will promote competition in the mobile services marketplace." Second Report and Order, (Regulatory Treatment of Mobile Services ), 9 F.C.C.R. 1411, 1418 (1994). The FCC has also recognized that equalizing the regulatory requirement for all wireless communications providers in order to allow all providers to offer similar service packages is required by Congress's command that comparable mobile services receive similar regulatory treatment. According to BellSouth, subjecting the Bell Companies to a structural separation requirement violates the FCC's announced policy of regulatory symmetry.
 
 
 71
 BellSouth's strongest argument is perhaps that the factual predicate which justified the structural separation requirement is no longer valid. BellSouth points out that the FCC believes that the safeguards such as mandatory interconnection enforceable by individual complaint process suffice to combat possible discrimination and cross-subsidization in the Personal Communication Service industry. BellSouth claims that this removes any justification for retention of the structural separation requirement for Cellular licenses, and that the FCC has arbitrarily failed to remove the restriction.
 
 
 72
 In response, the FCC argues that it is entitled to take a "one step at a time" approach, National Ass'n of Broadcasters, 740 F.2d at 1207, and that, while it expected Personal Communications Service to offer services in competition with Cellular service, it never found the Personal Communications Service and Cellular industries to be identical. According to the FCC, the difference in the two industries justifies its decision to treat the Bell Companies differently.
 
 
 73
 We agree with BellSouth that the time is now for the FCC to reconsider whether to rescind the structural separation requirement. Although the FCC correctly points out that it normally is not required to address every possible issue in one proceeding, after fourteen years further delay in determining whether to rescind the structural separation requirement severely penalizes the Bell Companies at a time when the wireless communications industry is exploding and changing almost daily. The disparate treatment afforded the Bell Companies impacts on their ability to compete in the ever-evolving wireless communications marketplace.
 
 
 74
 In refusing to impose a structural separation requirement for Personal Communications Service licensees, the FCC determined that (1) the public interest is served by allowing local exchange carriers to obtain Personal Communications Service spectrum to provide a broad portfolio of services, (2) Personal Communications Service and Cellular providers will compete for customers on price, quality, and service, (3) a symmetrical regulatory structure for wireless communications service providers is required by Congressional mandate, and (4) safeguards other than a structural separation requirement adequately guard against possible discrimination and cross-subsidization. In light of these findings, we believe the FCC was required to give a reasoned explanation for its disparate treatment of the Bell companies. Instead, the FCC simply stated that the record in the Personal Communications Service proceedings was insufficient to determine whether to eliminate the structural separation requirement. We believe this to be arbitrary and capricious given the somewhat contradictory findings of the FCC during the course of the Personal Communications Service rulemaking and related proceedings. If Personal Communications Service and Cellular are sufficiently similar to warrant the Cellular eligibility restrictions and are expected to compete for customers on price, quality, and services, see, e.g., Second Report and Order, 8 F.C.C.R. at 7710, 7715, what difference between the two services justifies keeping the structural separation rule intact for Bell Cellular providers? The FCC provides no answer to this question, other than its raw assertion that the two industries are different. In the absence of a reasoned explanation as to why the structural separation rule remains viable for Bell Company Cellular providers, we believe that the FCC should reexamine whether the structural separation requirement placed on the Bells still in any way serves the public interest. See Geller v. Federal Communications Comm'n, 610 F.2d 973, 980 (D.C.Cir.1979) (requiring the FCC to reexamine rules adopted in furtherance of copyright legislation where it appears that the rules no longer serve the public interest).
 
 
 75
 Further, time is of the essence on this issue, because the FCC is currently auctioning off the Personal Communications Service licenses. New Personal Communications Service licensees expect to be providing service early next year. The structural separation requirements will prevent the Bell Companies from competing with Personal Communications Service providers on a level playing field. Accordingly, we believe the FCC should determine as soon as possible whether the structural separation requirement placed upon the Bells is necessary and in the public interest.
 
 
 76
 We remand this matter to the FCC with instructions to promptly conduct an inquiry into whether the structural separation requirement continues to serve as a necessary regulatory restriction on BellSouth and other Bell Operating Companies.
 
 CONCLUSION
 
 77
 The Cincinnati Bell petition is GRANTED and the matter is remanded to the FCC for further proceedings in accordance with this opinion.
 
 
 78
 The Radiofone petition is GRANTED and the matter is remanded to the FCC for further proceedings.
 
 
 79
 The BellSouth petition is GRANTED and the matter is remanded to the FCC for further proceedings.
 
 
 
 *
 The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Generally speaking, "spectrum" is the range of radio frequencies within which wireless communications providers may operate. To provide complex and technologically sophisticated services to customers, wireless providers need a larger bandwidth of frequencies. Hence, allowing Specialized Mobile Radio providers to aggregate spectrum allows them to provide more complex personal mobile communications services
 
 
 [2]
 The Cellular spectrum had been allocated in twenty-five MHz blocks on which the Cellular providers provided service. The effect of the FCC ruling was to limit Cellular providers to one twenty-five MHz Cellular block and one ten MHz Personal Communications Service block in any one geographic area for a total of thirty-five MHz of spectrum. Other Personal Communications Service providers could acquire up to forty MHz
 
 
 [3]
 The cross-ownership restrictions, 47 C.F.R. Sec. 24.204(a)-(f), prohibit a Cellular licensee from obtaining a thirty MHz Personal Communications Service license in any region in which there is a significant overlap between the Cellular license area and the Personal Communications Service license area. "Significant overlap" is defined in Section 24.204(c) and occurs when ten or more percent of the population of the Personal Communications Service area is within the Cellular service area
 
 
 [4]
 As explained previously, currently there are two Cellular licensees in each geographic region. This duopoly structure in the Cellular market, according to the FCC, is not fully competitive. The FCC asks us to defer to its predictive judgments in attempting to increase competition in the wireless communications market. We note, however, that the 'less than fully competitive' Cellular market, created by the FCC at Cellular's birth in 1981, is the result of the FCC's prior predictive judgments concerning competition in the wireless industry. Given this fact, we find the FCC's request that we defer to its current unsubstantiated economic forecasts unpersuasive
 
 
 [5]
 In response to Radiofone's argument, the FCC points out that issues concerning Mobile Satellite Service frequencies currently are the subject of a separate rulemaking proceeding and it is impossible to know at this point precisely how those frequencies will be regulated. We believe the difference that currently exists between Mobile Satellite Service and Cellular, in the services provided and the technologies currently available to each, justifies the FCC's decision to address the Mobile Satellite Service issues in a different rulemaking proceeding
 
 
 [6]
 In its reply brief, Radiofone asks this Court to strike down the aggregate forty-five MHz cap, claiming that it is premised on the irrational Cellular eligibility restrictions. We decline to do so. This issue was not presented to the Court in Radiofone's initial petition